UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------   x

PAUL DU QUENOY,                                   :
                                                  :   Civil Action No:
            Plaintiff,                            :
                                                  :
                                                  :
     - v -                                        :
                                                  :
AMERICAN UNIVERSITY OF BEIRUT,                    :   COMPLAINT
FADLO KHURI, and TRUDI HODGES,                   :
                                                  :   JURY TRIAL DEMANDED
            Defendants.                            :
                                                  :
---------------------------------------------------------   x

     Plaintiff Paul du Quenoy, by his attorneys, as and for his Complaint against Defendants, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

     1. This case arises from the virtual destruction of the distinguished and unblemished career of a history professor who spent nearly a decade contributing to the mission of the American University of Beirut (AUB).  The actions, false justifications, and subterfuge by Defendant AUB and its agents, described below, persecuted a male professor who had done nothing but contribute to the advancement and successes of his students.

     2. Beginning with unfounded "concerns" about alleged "harassment" raised on an informal basis by Sally Smith ("Smith"),[1] a fourth-year female AUB student, AUB's administration and its agents took a series of actions against Prof. du Quenoy with bias and malice, based on false premises, pretext, and gross manipulation of evidence, in breach of his

---

[1] Prof. du Quenoy's accuser and all other individuals enrolled as students of AUB at any time during the investigation will be referred to pseudonymously for the purposes of this complaint to protect her privacy, subject to any orders the Court may enter.

contract and violation of institutional policy, United States and New York law, fundamental due process, and Prof. du Quenoy's civil rights.

3.  On October 23, 2017, Defendant Khuri, as AUB's president, ordered an investigation of Prof. du Quenoy, purportedly pursuant to Title IX, following Smith's informal report of her "concerns," and carried out despite Smith having said unequivocally that she did not wish to file a formal complaint against Prof. du Quenoy or for any sanction to be imposed on him.

4.  President Khuri appointed a handpicked "fact-finding" panel, all of the voting members of which (AUB faculty members Issam Srour, Ghassan Matar, and Fida Afiouni) had received training inherently biased against male targets of sexual harassment complaints.

5.  Committed to a program of overzealous enforcement of Title IX principles, President Khuri himself served as the final decision maker in the investigation he himself had initiated.

6.  Prof. du Quenoy was not informed of the investigation against him for weeks, until November 7, 2017; was only informed of the basis for the investigation two weeks after that; and has not *at any time* been permitted to read the complaint against him.

7. On January 10, 2018, the panel issued a "final report," finding Prof. du Quenoy "responsible" for violating AUB's "Policies Concerning Sexual and Other Discriminatory Harassment" (2012) in relation to Smith's false claims, including a finding that he had exchanged a customary social greeting of a hug and kisses on the cheeks "on three occasions" – something that Smith alleged happened only *twice*.  Prof. du Quenoy was found, without corroborating evidence, to have said things of a "romantic nature" at mostly unspecified dates, times, and locations.  AUB received no allegation and disclosed no evidence that Prof. du Quenoy attempted to engage in any act of sex, sexual touching, coercion, violence, stalking, repeated advances or attempts at physical contact, sexually degrading language, display of sexually suggestive objects or images in the workplace, any suggestion of a "quid pro quo"

exchange of anything of a "sexual" or "romantic" nature – in short, there was no evidence that

Prof. du Quenoy's alleged conduct even approached "sexual harassment" as defined in AUB's

Policies or United States law.  Further, Smith never claimed, nor did the panel find, that she

asked Prof. du Quenoy to refrain from speech or conduct of any kind, or that she ever told him

that she found any speech or conduct to be unwanted, offensive, hostile, or otherwise

inappropriate.

8. The panel's first "final report" of January 10, 2018, omitted any record of interviews

with multiple witnesses who testified favorably to Prof. du Quenoy, but included the testimony

of witnesses who testified unfavorably, some of whom were interviewed in violation of AUB's

procedures, but none of whom substantiated any conduct or allegation of conduct rising to any

definition of "sexual harassment."  The panel deemed Prof. du Quenoy's attempts to defend

himself against the charges against him "aggravating factors" to support a finding of

"responsibility" (guilt), and blamed him simply for denying the allegations against him,

providing his own account of the facts, and failing to show "remorse" for alleged actions he did

not commit. The panel recommended that Prof. du Quenoy receive "the strongest possible

sanction" of "termination for cause," a sanction unjustifiably disproportionate and severe.

9. After receiving Prof. du Quenoy's written response to its "final" report on January 19,

2018, and in direct violation of AUB's procedures, the panel reopened its investigation, collected

additional information, removed a significant body of exculpatory evidence from its

supplementary materials (i.e. "Appendix E: Student Evaluations"), and prepared a sanitized

second version of its "final" report.

10. On January 21, 2018, Prof. du Quenoy notified AUB's administration, including

Defendants Khuri and Hodges, that he had engaged legal counsel to assist him in the

investigation.  Only three days later, on January 24, 2018, upon information and belief, the panel

3

recommended, and President Khuri decided, to place Prof. du Quenoy on administrative leave "until further notice," banned him from AUB's campus (with exception for medical treatment), denied him access to essential campus facilities for his continuing research, prohibited him from contacting any currently enrolled AUB student, and subjected him to a reduction of work duties.

11.  On January 30, 2018, the panel issued the second, sanitized version of its final report. Again, the panel recommended the maximum sanction of "termination for cause."

12.  The procedures for adjudicating the allegations against Prof. du Quenoy were deficient under any standard.  He was not informed of the charges against him in advance; not allowed to have a copy of the complaint, either version of the panel's report, witness statements, or any other written evidence at any time; and was required to prepare his "defense" only by reviewing the panel's report and supporting documents under strict supervision by AUB personnel. Prof. du Quenoy was repeatedly harassed during the review process; on one occasion, while reviewing the panel's second version of the final report, he was interrupted by a uniformed AUB security officer sent to eject him from the premises.

13.  On February 15, 2018, President Khuri delivered a final decision, pronouncing Prof. du Quenoy "responsible" for violations of unspecified sexual harassment policies, purportedly present in AUB's Policies, in relation to Smith's false claims.  AUB's procedures allow no appeal.  On the same day, and also with no possibility of appeal, President Khuri imposed a sanction of administrative leave without pay from February 15, 2018 to August 31, 2019, virtually terminating the balance of Prof. du Quenoy's employment contract (which expires on September 30, 2019), banning him from campus during that time, barring him from initiating contact with "any individual who is (or was) a student of AUB" as of February 15, 2018, and imposing other sanctions.

4

14. Prof. du Quenoy therefore brings this action for relief from violations of Title IX of the Education Amendments of 1972, breach of his contract, estoppel, invasion of privacy, intentional infliction of emotional distress, and, following exhaustion of administrative remedies (now pending), for violations of Title VII of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1332 and 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) the Parties are citizens/residents of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

16. Venue in this District is proper, pursuant to 28 U.S.C. §1391, because AUB has a headquarters office in this judicial district, is deemed to reside in this judicial district, and, on information and belief, has expressly and/or implicitly waived any assertion of jurisdiction or venue in any other district.

## THE PARTIES

17. The Plaintiff is a male citizen of the United States. During the events described herein, the Plaintiff was a faculty member of the American University of Beirut holding the rank of Associate Professor in AUB's Department of History and Archaeology.

18. Upon information and belief, Defendant American University of Beirut (AUB) is a not-for-profit corporation, incorporated in New York (continually since 1863) and doing business in this district from its New York Office, located at 3 Dag Hammarskjold Plaza, New York, New York 10017. AUB operates a private university with its main campus in Beirut, Lebanon, with regular programs and activities in this district. AUB enrolls approximately 9,000

students.  AUB, upon information and belief, is governed by a Board of Trustees consisting of 37 members.  Upon further information and belief, AUB's Board of Trustees oversees and approves AUB's written policies including those addressing discriminatory harassment.  Plaintiff will amend this complaint, with leave of Court if required, to name the Board of Trustees, and/or individual trustees, as defendants, if it is determined, through discovery or otherwise, that complete relief cannot be accorded in their absence.

19. Upon information and belief, Defendant Fadlo Khuri is an individual who is a citizen of the United States and was president of AUB at all times during the investigation.  Upon further information and belief, President Khuri, in his capacity as an agent of AUB and final arbiter of AUB's investigative process, exceeded and/or abused his authority in doing some or all of the actions alleged herein, causing harm to Plaintiff.

20. Upon information and belief, Defendant Trudi Hodges is an individual who is a citizen of the United States, and was AUB's Title IX coordinator and chairman of the "fact-finding" panel appointed to investigate Prof. du Quenoy at all relevant times herein. Upon further information and belief, Defendant Hodges, in her capacity as an agent of AUB and leader of AUB's Title IX office and all relevant investigative processes, exceeded and/or abused her authority in doing some or all of the actions alleged herein, causing harm to Plaintiff.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.     Agreements, Representations, Covenants
and Warranties Between AUB and Plaintiff**

21. Prior to joining the faculty of the American University of Beirut, Prof. du Quenoy began an exceptionally promising academic career.  He received his Ph.D. in History, with distinction, from Georgetown University, and taught there and at other institutions for several years, receiving multiple prestigious fellowships (including a Fulbright) and publishing

research in highly respected, peer-reviewed journals.  Prof. du Quenoy was subject to no allegations of any form of discriminatory harassment.

22. In 2008 Prof. du Quenoy was invited to join the faculty of AUB as Assistant Professor of History.  Prof. du Quenoy has, by all accounts, performed exemplary research and teaching, including publishing three well-received scholarly books and numerous articles, introducing innovative new courses, receiving exceptionally high teaching evaluations from more than 1,000 students (from a student body well over 50% female), and receiving additional prestigious grants and fellowships.  AUB recognized these achievements with highly positive annual performance evaluations, frequent above average merit-based salary increases, and, in 2012, by promoting Prof. du Quenoy to the rank of Associate Professor three years ahead of schedule.  Prof. du Quenoy also continued to develop as an internationally renowned commentator on international relations and arts critic.  Prof. du Quenoy has also actively promoted charitable causes related to his fields of expertise, including many years of voluntary service organizing world renowned charitable events in New York and Washington, D.C. that benefit disadvantaged persons.

23.  Prof. du Quenoy serves under a written contract with AUB for a fixed term, to expire on September 30, 2019.  Pursuant to this agreement, Prof. du Quenoy is entitled to the benefit of policies of AUB to the extent not expressly inconsistent with its terms, and, upon information and belief, on the same basis as all similarly situated faculty and staff.

24.  The agreement between Prof. du Quenoy and AUB entailed an expectation that AUB would fairly implement and enforce its official policies and procedures, in force from time to time, and would comply with all relevant United States laws and directives relating to Prof. du Quenoy's employment.

25.  The agreement contained implied covenants of good faith and fair dealing, both of the type inherent in all agreements, and also specific to the interests of a professor such as Prof. du Quenoy, whose career would be particularly vulnerable to actions of an institution taken in bad faith.  The implied covenant implicitly guaranteed that any decisions or other proceedings by which Prof. du Quenoy's rights under the contract could be materially affected would be conducted with basic fairness, and honesty in fact.

26. Prior to October 2017, Prof. du Quenoy had no disciplinary record of any kind, and had never been accused of or investigated for any form of discriminatory harassment or any other violation of university policy.  AUB and its agents inspected Prof. du Quenoy's personnel file in connection with the events alleged herein, and were fully aware of these facts at all relevant times herein.

**B.      AUB's Deficient Sexual Harassment Enforcement**

27. Upon information and belief, in the years leading up to the investigation AUB exhibited scant commitment to prevention of sexual harassment.  AUB provided no form of sexual harassment training to faculty members until August 2011, three years after Prof. du Quenoy joined the AUB faculty; since then, it provided in-person sexual harassment training sessions only to *newly appointed* AUB faculty members, and only in the form of one informational session lasting approximately 45 minutes.   Even when AUB established an online tutorial, ostensibly to address discriminatory harassment, in July 2017, it did little or nothing to ensure that faculty members participated in or completed the training. Ms. Hodges stated at a meeting of AUB's Faculty Senate on March 2, 2018 that only 15% of AUB faculty members had completed the online discriminatory harassment training tutorial as of that date. Defendant Khuri confirmed this figure in his official "President's Perspective" notice of April 16, 2018.

8

28. A session of the AUB Faculty Senate held on March 2, 2018, revealed that "among the faculty there is a substantial lack of awareness of Title IX's goals, functions and procedures."

29. On April 4, 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") issued a guidance letter to colleges and universities that receive United States federal funds, widely known as the "Dear Colleague Letter" (the "April 2011 Letter"). The April 2011 Letter advised recipients that sexual harassment constitutes discriminatory harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. and its regulations. DOE OCR directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

30. Catherine Lhamon, then Assistant Secretary for Civil Rights at the U.S. Department of Education, told a group of college administrators at a 2014 conference that the ultimate punishment for violating Title IX is complete revocation of federal funds from offending institutions, adding "Do not think it's an empty threat." These comments were widely publicized in the media.

31. The Defendants were at all times relevant herein aware that apparent compliance with the April 2011 Letter was vitally important to avoiding investigation by DOE OCR and to retaining United States federal funding.

32. On December 12, 2012, more than 20 months after the April 2011 Letter was issued, AUB published its "Policies Concerning Sexual and Other Discriminatory Harassment" ("AUB's Policies") and "Procedures to Address Formal Allegations of Sexual and Other Discriminatory Harassment" ("AUB's Procedures").  Upon information and belief, the Policies and Procedures in their current form were authorized by AUB's Board of Trustees in 2012. They have not been revised since that time.

33. AUB's Policies and Procedures are expressly intended to support persons complaining of sexual harassment, virtually all of whom are female, and not those accused, virtually all of whom are male. While "members of the AUB community who believe that they are the subject of discrimination, sexual or other discriminatory harassment … have recourse to informal and/or formal avenues to address their concerns," AUB's Policies extend no recourse to persons accused of harassment.  Further, while AUB affords complainants "assistance in determining the exact nature of the complaint and the appropriate procedure to be followed" prior to any investigation, it offers no assistance to those accused.  Upon information and belief, AUB knew, when it wrote its Policies and Procedures, that nearly all complainants of sexual misconduct are women and that nearly all respondents in sexual misconduct cases are men.  AUB's Policies and Procedures, as written and as applied, are more protective of women than of men, and AUB so intended.

34. On April 29, 2014, DOE OCR issued additional directives to colleges and universities in the form of a guidance document titled "Questions and Answers on Title IX and Sexual Violence" ("Q&A"). Like the April 2011 Letter, the Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

35.  On September 22, 2017, more than one month before President Khuri ordered the investigation of Prof. du Quenoy, DOE OCR rescinded the April 2011 Letter and the Q&A issued on April 29, 2014, and replaced them with a new binding guidance, "Q&A on Campus Sexual Misconduct" ("the 2017 Guidance") while the current U.S. administration reviewed and revised practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding.

36. AUB, however, revised none of its Policies or Procedures in response to the 2014 Q&A, or the 2017 Guidance.  AUB's failure to adopt or apply the 2017 Guidance (which superseded both the April 2011 Letter and the 2014 Q&A) contributed substantially to a biased and unfair investigation and decision in the case of Prof. du Quenoy and, upon information and belief, in other cases.

37. The 2017 Guidance requires that schools apply a uniform evidentiary standard across sexual harassment cases and other cases of alleged misconduct; in contravention of this provision, AUB uses the preponderance of the evidence standard in discriminatory harassment cases but different standards in other disciplinary proceedings.

38. The 2017 Guidance further requires that a school, upon opening an investigation, provide the responding party with "sufficiently detailed" written notice of the allegations, including specific details such as "the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident."  In contrast, the only written notice provided to Prof. du Quenoy – President Khuri's letter to him of November 7, 2017 – (a) did not identify Sally Smith as one of the parties involved or as the reporting party, (b) did not state which section of AUB's Policies Prof. du Quenoy allegedly violated, (c) did not identify the "precise conduct" that allegedly constituted the potential violation of AUB's Policies, and (d) did not state the date or location of the alleged violations.

39.  The 2017 Guidance also requires that "any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."  In violation of this provision, AUB's Title IX office provides extensive resources for individuals who claim to "have experienced discrimination or sexual harassment

or assault," but provides no resources to individuals accused of sexual harassment, nor did it provide any such resources to Prof. du Quenoy.

40.  The 2017 Guidance suggests that parties be permitted to appeal a decision, but AUB's Procedures do not allow for an appeal of any decision, or of any sanctions imposed in discriminatory harassment cases.  Other investigative procedures at AUB, however, do allow for an appeal.

41.  As President Khuri stated in a video recorded speech of March 31, 2017, AUB awaited with "trepidation" any changes to Title IX policy made by the current U.S. administration, which was widely expected to provide greater procedural rights for respondents, and did so by way of the 2017 Guidance.  On or about September 7, 2017, just two weeks before DOE OCR issued the 2017 Guidance, Ms. Hodges "re-Tweeted" on her public Twitter account her apparent agreement with harsh criticisms of the impending changes to Title IX policy ("will be devastating," and "deeply troubled"). Resisting DOE OCR measures that would promote equity and fairer treatment of respondents, President Khuri, Defendant AUB under his leadership, and Ms. Hodges as AUB's Title IX coordinator, did not adopt, apply, or even acknowledge the 2017 Guidance or the more equitable procedural rights for respondents provided therein.

42. At each stage, from OCR's issuance of the April 2011 Letter, through the investigation of Prof. du Quenoy, AUB was laggard and negligent in adopting Title IX policies as required by DOE OCR's directives.  In addition to delaying the issuance of its Policies and Procedures regarding harassment by more than 20 months after the April 2011 Letter, AUB did not maintain an operating Title IX office led by a Title IX coordinator until August 2014, more than three years after the April 2011 Letter was issued.  As noted, and with material

consequences for Prof. du Quenoy, AUB took no action to conform to 2014 Q&A or the 2017 Guidance.

**C.**     **Sources and Motives of Bias of Defendants AUB and Khuri**

43. Upon information and belief, Defendants exhibited their zeal for compliance with United States law, in part, by deliberate over-enforcement of Title IX policies.  In President Khuri's words, "Title IX is therefore a vital component of a key overall goal of the university, which is to model a fair and just society by effectively addressing any and all forms of harassment."

44. Prof. du Quenoy's case arose after a particularly difficult period during which AUB suffered significant reputational damage from publicized corruption scandals in which multiple members of AUB's senior administration, including President Khuri's immediate predecessor, among others, resigned or were fired amid serious allegations of fraud, malfeasance, tax evasion, and other possible crimes.

45. AUB and President Khuri had additional motivations to appear zealous in their enforcement of Title IX's requirements.  In a public address of March 16, 2016, President Khuri stated that his "vision for the University is nothing less than restoring AUB to the rank of world-class universities," a vision that includes an ambitious fundraising campaign ("BOLDLY AUB") with the goal of raising $650 million.   The potential for success of this fundraising campaign depends heavily upon Defendants' cultivation of a positive public image, at least partially reflected in AUB's compliance with U.S. law and policy, and in sensitivity to matters of actual and perceived public concern, including AUB's approach to sexual harassment and sexual harassment policy.

46. AUB suffered additional reputational problems that created enormous pressure to appear zealous in enforcing United States law when, in March 2017, AUB settled a civil fraud

lawsuit filed against it by the U.S. government for having used United States federal funds to train representatives of Hezbollah, a political party officially designated a terrorist organization by the U.S. government.  Pursuant to the widely publicized settlement, AUB agreed to pay $700,000 to the U.S. government; admitted guilt to holding workshops attended by representatives of prohibited entities, including such entities in the NGO database; and agreed to revise its internal policies to ensure compliance with all United States laws and to submit to comprehensive oversight by the U.S. government.

47. Upon information and belief, Defendants were well aware of these developments and of their consequences for the university and numerous senior administrators, including increased scrutiny for AUB's compliance with applicable law and policies.

**D.**     **Gender and Racial/Ethnic Bias Evidenced in AUB's Administration**

48. Men are severely underrepresented in AUB's administrative bodies for Title IX enforcement and advancement of "equity," even though AUB employs large numbers of eligible males.  President Khuri personally appointed all members of these bodies, even though almost all other AUB administrative bodies are elected by the faculty, and even though President Khuri's administration maintains an outspoken commitment to "shared governance" with the faculty.

49.  On December 2, 2015, President Khuri announced a "Task Force on the Lives and Careers of Women at AUB." The declared "key focus" of the Task Force was "female faculty," later extended to "female staff and students."  Neither President Khuri nor AUB has ever pursued any initiative to "focus" on male members of the AUB community.

50. President Khuri stated that the Task Force consisted of "women and men faculty members," but 11 of its 14 members were women, as were both of its co-chairs.

51. On January 22, 2016, President Khuri announced an "Equity and Title IX Working Group" with a "specific mandate to review current University policies and processes for addressing Title IX (gender equity) and other forms of discrimination including harassment."

52. The Working Group's membership was also overwhelmingly female, with nine female members (including its chair) but only four male members.

53. On October 3, 2017, President Khuri appointed a permanent "Equity & Title IX Network."  The Network has "diverse functions: grievance and discipline; education, training, victim support and protection; public health and wellbeing; and legal and compliance" [sic]. The Network has no function to support, protect, or even consider the needs or rights of respondents, including due process rights.

54. The Network consists of the Title IX coordinator (i.e. Ms. Hodges), a six-member "Advisory Council," 15 "Deputy Title IX Coordinators," and a "panel pool" of AUB community members to investigate harassment cases.  Five of the six Advisory Council members (including panel member Srour) are women.

55. AUB's Deputy Title IX coordinators "serve as champions for non-discrimination and anti-harassment efforts in their respective faculty, school, or unit" [sic].  AUB offers no "champions" or other personnel in any role to support individuals accused of discriminatory harassment, virtually all of whom are men.  The administrative position and professional activities of Deputy Title IX coordinators are thus intended to be more protective and solicitous of women than of men.  Of the 15 Deputy Title IX coordinators, 12 are women.

56. All voting members of the panel appointed by President Khuri to investigate Prof. du Quenoy's case (AUB faculty members Issam Srour, Ghassan Matar and Fida Afiouni) served as Deputy Title IX coordinators at all relevant times herein.

57. AUB has never appointed any university-wide body or even one official to provide assistance in any form to individuals (students or faculty) accused of discriminatory harassment, or to men.

58. Additionally, AUB hosted and supported the "Knowledge Is Power Project on Gender & Sexuality" ("KIP Project"), a "multidisciplinary project aimed at supporting the production and dissemination of information related to gender and sexuality in Lebanon" and "to build bridges between stakeholders working in the field, including academics, civil society members, students, public and private sector representatives, and others."  According to AUB's President's Office, "the Equity & Title IX initiative collaborated closely with the KIP Project on Gender & Sexuality" and also co-sponsored its activities.

59. The KIP Project's executive staff listed on its website are women, as are 25 of its 29 Advisory Board members, including Ms. Hodges and panel member Afiouni.  Upon information and belief, virtually all of the "stakeholders" referred to in the KIP Project's mission statement are women.

60. Ten of the KIP Project's 14 funded studies dealt exclusively with women or with sexual harassment victims, as did all three of the KIP Project's "Private Reading Circles" and all five of the KIP Project's "Private Roundtables."

61.  The KIP Project's only conference, sponsored by AUB and held on its campus, March 31-April 1, 2017, featured 16 discussion panels, of which 14 were oriented toward women while, none was oriented toward men. Of the conference's 93 participants, 72 were women, including Ms. Hodges and panel member Afiouni.

62. The KIP Project partnered with an organization listed on its website as "Women in Front," whose very name suggests that women should occupy a privileged position relative to men.

63. The KIP Project publicly endorsed a social media campaign called "#MeshBesita" ("#It's Not OK"), whose most visible media engagement is an internet video dramatizing situations of women being "harassed" by men, but no situation in which a woman harasses a man, or any instance of same-sex harassment.

64. Further, the "#MeshBesita" campaign intends to "raise awareness" of sexual harassment by means of allegations against men unverified by investigation. Title IX and AUB's Policies (if properly applied), however, *require* investigations of serious sexual harassment allegations, according due process and a presumption of innocence, before "responsibility" can be assessed and before any sanction can be imposed.

65. Upon information and belief, AUB has done nothing to protect or even consider the rights of individuals accused of discriminatory harassment, or the rights of men.  To the contrary, in June 2018 AUB denied tenure to 34 professors, of whom 32 were male.  Upon information and belief, 21 of these individuals have retained counsel and filed appeals alleging serious violations of procedure by AUB and President Khuri, based in part on the role gender played in the process, in that female applicants were evaluated on lower standards of achievement, and enjoyed a higher success rate as a result.

66. President Khuri harbored clear biases relevant to his functions in this case.  On March 31, 2017, at the opening of the KIP Project conference, he stated that a belief in "the superiority of women" was something "I was all too happy to adopt myself."  He continued that complainants in sexual misconduct cases should not bear "the onus" to "be more cautious and conservative and more understanding of certain actions that are unacceptable."  President Khuri thus placed this "onus" of responsibility for sexual harassment upon respondents.

67. In relation to Prof. du Quenoy's case, President Khuri exhibited his biases in a March 6, 2018, letter to the American Association of University Professors (AAUP), in which

he lauded Smith for summoning "great courage" in raising her claims (which were neither proved nor found by the panel or President Khuri to be factual), and praised Ms. Hodges as a "dedicated female staff member of our team" (emphasis added), while denigrating Prof. du Quenoy's legal and professional rights as "the supposed 'rights' of one faculty member" who is male.  President Khuri stated, in effect, that upholding the due process rights of respondents is inherently less important than indulging all presumptions in favor of complainants.

68.  President Khuri's bias was further demonstrated in a "President's Perspective" e-mail to the entire AUB community of February 15, 2017, in which he ostensibly espoused an unlawful policy (formal or informal) of quota-based affirmative action for the advancement of women in AUB's administration based on sex alone: "Equality is not just about fairness and transparency … Women comprise between 53% and 55% of the population, so it makes sense to have at least that proportion of the most outstanding women in [AUB] leadership positions."

69. President Khuri's message of February 15, 2017 also admonished the AUB community that "making someone feel uncomfortable is not acceptable" and "[i]f it feels wrong, it generally is wrong."  President Khuri's statement was contrary to law, and to AUB's Policies, which provide that "for conduct to be deemed harassing under this policy, it must be perceived as hostile, intimidating, or offensive," not merely "uncomfortable" or something that "feels wrong." AUB's Policies further provide that conduct "cannot be deemed hostile, intimidating, or offensive solely on the basis of the complainant's subjective opinion," but must be perceived as harassment "not only from the perspective of the complainant, but also from the perspective of an objective observer."

70.  Since President Khuri became AUB's president in September 2015, AUB has received a dramatically increased number of reports, and conducted an increased number of investigations, of alleged discriminatory harassment. According to President Khuri, the number

of reports received in the 2016-2017 academic year was "triple the number of reports for 2015-2016, and equal to the *combined* total for the previous three years" (emphasis in original). President Khuri further stated that AUB should expect to receive "hundreds" of reports annually.

71. Since President Khuri made these statements of bias and undertook his biased initiatives, harassment investigations at AUB have resulted in a significantly increased proportion of adverse findings against respondents, and in the imposition of sanctions against those respondents. In the 2016-2017 academic year, 70% of respondents investigated for alleged discriminatory harassment were found "responsible," and were sanctioned, for alleged violations of AUB's Policies, compared to approximately 50% in each of the two previous years. Upon information and belief, the high statistical probability of adverse findings and sanctions against respondents facilitated, in at least one case, the blackmailing of a male faculty member by a female student who threatened him with false Title IX claims to gain advantage in an academic dispute.

72. The panelists selected by President Khuri were plainly biased against Prof. du Quenoy. While AUB's Procedures and the 2017 Guidance preclude persons with "actual or reasonably perceived" conflicts of interest or biases from leading investigations, Ms. Hodges, and each of the three voting panelists (AUB faculty members Srour, Matar, and Afiouni) had conflicts of interest, both "real or perceived," in this case.

73. Ms. Hodges arrived at AUB as Title IX coordinator in 2014. Upon information and belief, she had no professional qualifications for the position, holding degrees in business administration and having never before worked in any known capacity involving Title IX or higher education.

19

74. Ms. Hodges served on the Advisory Board of the KIP Project, and thus was committed in a leadership role to an initiative led almost exclusively by women, which pursued projects almost exclusively addressing women, and espoused activities evidencing significant anti-male bias, including presumption of guilt without due process in sexual harassment cases. At no time in the course of the investigation did Ms. Hodges disclose her KIP Project Advisory Board membership.

75. Prior to the investigation, President Khuri appointed Ms. Hodges to serve on AUB's Equity & Title IX Working Group and Equity & Title IX Network, both of which were intended to be more solicitous and protective of complainants than of respondents in enforcing university sexual harassment policy, and thus more solicitous and protective of women than of men.  AUB knew or should have known of her anti-male biases. At no time in the course of the investigation did Ms. Hodges disclose her participation in either of these gender-biased university bodies, or the gender-biased recommendations of those bodies.

76. Ms. Hodges revealed her biases, in part, through her disdainful treatment of Prof. du Quenoy.  Rather than offer him even basic assistance in the investigation against him, she intentionally denied him information about the case, told him that he was not welcome to visit her office (saying, for example, "You can't just come in here," when he entered by the open door, during business hours), and responded to his requests for information in a manner both offensive and intimidating ("Why do you want to know?").  She turned his attempt to assert his legal and procedural rights against him when, on November 29, 2017, she attempted physically to remove a summary of Smith's panel interview from his hands before he had completed his reading; when Prof. du Quenoy said that he was willing to seek court intervention to protect his legal and procedural rights, she reported it as an attempt to "intimidate" her, which the panel ultimately counted as an "aggravating factor" against him in the case.  Further, Ms. Hodges

supported the panel's retaliatory recommendation that Prof. du Quenoy be placed on administrative leave, banned from campus, and prohibited from contacting all AUB students (even male students), after Prof. du Quenoy retained legal counsel. President Khuri followed this recommendation. Neither he nor AUB provided any justification for these measures despite several requests.

77. At all times during the investigation, all three voting panelists served as "Deputy Title IX coordinators," an administrative position instituted and intended by AUB to be more protective and solicitous of complainants than of respondents, and thus more protective and solicitous of women than men. At no time in the course of the investigation did the voting panel members collectively or individually disclose that they were Deputy Title IX coordinators or discuss the nature of that office and its functions.

78. Panel member Srour also serves as the only male member of the Equity & Title IX Network's Advisory Council, which advises on policies that are more solicitous and protective of complainants than respondents. At no time in the course of the investigation did Srour disclose his membership on the Network's Advisory Council.

79. Panel member Afiouni, like Ms. Hodges, is also listed as a member of the KIP Project's Advisory Board. When Prof. du Quenoy arrived for his panel interview, Afiouni exhibited animosity and bias toward him by refusing to shake his hand and treating him with open hostility. Like Ms. Hodges, Afiouni did not disclose her KIP Project Advisory Board membership at any time in the course of the investigation.

80. Prof. du Quenoy raised several procedural and bias-related concerns in a letter to President Khuri on November 24, 2017. President Khuri replied that these concerns had "no merit" and took no action. Prof. du Quenoy reiterated these concerns in his written responses to

both versions of the panel's "final report." President Khuri did not address them, did not

account for them in reaching his decision, and took no other action in response.

**E.**   **Bias in AUB's Title IX Training**

81.   The training provided to AUB's investigators in Title IX cases promotes unfair

procedures and biased fact-finding.  Up to the time of the investigation, the only training

provided to members of the "panel pool" and Deputy Title IX coordinators – and thus to panel

members Srour, Matar, and Afiouni – was a two and one-half day program by the Association

of Title IX Administrators (ATIXA) administered on May 18-20, 2017 by an unidentified

"expert" from the National Center for Higher Education Risk Management (NCHERM).  AUB

conducted no subsequent training session for discriminatory harassment investigators between

May 20, 2017 and the time of the investigation.  Defendants have not disclosed the content of

this training, in whole or in part, but ATIXA's website provides a "sample agenda" of the

training.  Upon information and belief, the training provided to AUB did not significantly

differ or depart from this sample agenda.

82.   The ATIXA training provided to AUB consists of eight sessions.  While at least

one session in its entirety addresses the rights and needs of complainants in sexual harassment

investigations, the program includes no session, nor even a part of a session, addressing the

rights or needs of respondents in sexual harassment investigations.

83.   This bias is confirmed in other ATIXA publications, including a 2016 "white

paper" titled "The Seven Deadly Sins of Title IX Investigations" ("The Seven Deadly Sins"),

which is widely available and, upon information and belief, provided to individuals who

receive ATIXA/NCHERM training.

84.   The Seven Deadly Sins counsels that Title IX coordinators should be extremely

solicitous of complainants, recommending the provision of "sources of support such as

22

counseling and advocacy," "creating an interview environment that feels safe," cultivating "a comfortable space that affords privacy," "not draw[ing] attention to reporting parties," and "getting to know them as individuals, and not just as victims."  The Seven Deadly Sins includes no parallel provisions, or any provision at all, for the benefit or protection of respondents, regardless of their sensitivities or the potential injustice of the accusations against them.

85.  Remarkably, The Seven Deadly Sins cautions investigators against according respondents a presumption of innocence even if, for example, "the responding party *seems*, for one reason or another, more believable than the reporting party." (Emphasis in the original)

86.  The Seven Deadly Sins also encourages investigators to accord blamelessness and a presumption of truth only to complainants, and substantially to presume the guilt of respondents.

87.  Training of the type provided to AUB has been found to be biased in favor of complainants over respondents, and thus in favor of women over men, specifically because it trains investigators to accord a presumption of truth and blamelessness only to complainants and to regard respondents with suspicion and presumed guilt. Nevertheless, President Khuri described this training in a letter about Prof. du Quenoy's case to the AAUP of March 23, 2018, as "appropriate."

## F.     The Investigation of Prof. du Quenoy

88.  In Fall Semester 2017, Smith voluntarily enrolled in Prof. du Quenoy's History course, "Imperial Russia" as an elective course not required for her engineering major. In Fall Semester 2016, she had enrolled on that basis in Prof. du Quenoy's Fine Arts course "Verdi's Operas." Smith stated to the panel that she enjoyed the Fall Semester 2016 course and had no

problems with Prof. du Quenoy. She further stated that she never ceased to admire Prof. du Quenoy as a teacher, apparently without regard for her claims against him.

89.  During a class lecture on October 16, 2017, Prof. du Quenoy admonished Smith to respect classroom policy when she was seen by Prof. du Quenoy and witnessed by numerous other students reading a book during a class lecture. Smith argued with Prof. du Quenoy, personally insulted him with an epithet ("narcissist"), and was told to leave if she could not respect classroom policy or behave politely.  Panel interviews with five students present in the class confirmed this version of events. No witness refuted it, and Smith did not deny it.

90.  On October 17, 2018, just one day after the classroom incident, Smith raised, for the first time, alleged concerns about Prof. du Quenoy to her academic adviser, Prof. Ali Tehrani.  Prof. Tehrani referred Smith to AUB's Title IX office, and, upon information and believe, she presented her concerns to that office the same day.

91. Smith claimed that the conduct of concern to her occurred earlier in the semester, once following the first class of the semester on August 30, 2017, and at two other occasions at unspecified times, dates, and locations between August 30, 2017 and October 16, 2017.

92. According to the summary of Smith's interview with the panel, however, she "was against a formal process [*i.e.* a formal complaint of sexual harassment and investigation]," and further claimed she did not "want anything to happen to [Prof. du Quenoy] or his family because of her," and did not want "10 years from now to look back and think she ruined someone's life."

93. Smith alleged that Prof. du Quenoy had engaged in "inappropriate contact" that allegedly consisted of two hugs with accompanying cheek kisses, a common form of social greeting in Lebanon, and speech of an allegedly "romantic" nature.

94. Upon information and belief, Smith's "concerns" were communicated by the Title IX office directly to President Khuri, as president of AUB. On October 23, 2017, President Khuri determined on his "inherent authority" that Smith's concerns merited a full investigation and ordered the investigation.

95. President Khuri appointed a panel consisting of AUB faculty members Srour, Matar, and Afiouni as voting members. As AUB's Title IX coordinator, Ms. Hodges, served as the panel's non-voting chair.

96. The panel was convened to investigate alleged violations of AUB's Policies by Prof. du Quenoy, but no claim rising to any definition of sexual harassment had been alleged. AUB's Policies clearly define "sexual harassment." Examples include "repeated unwelcome flirtation, advances, or propositions; inappropriate and unnecessary physical proximity or contact; sexually degrading language used to describe an individual; display of sexually suggestive objects or images in the workplace; sexually-oriented messages or images sent by SMS or e-mail; all forms of sexual stalking; and sexual violence of assault."

97. On November 7, 2017, President Khuri informed Prof. du Quenoy of the investigation by letter. The investigation had been underway for approximately two weeks at that time. President Khuri provided copies of AUB's Policies and Procedures, but did not otherwise inform Prof. du Quenoy of the details of the complaint, as required by the 2017 Guidance.

98. The panel interviewed numerous witnesses over the course of its investigation, beginning with Smith. The interviews were not recorded or officially minuted but only summarized by Ms. Hodges based on notes she claims to have taken during the interviews.

99. In her interview, Smith informed the panel that she felt "embarrassed" by the classroom incident of October 16, 2017. Despite this admission, neither the panel nor

President Khuri considered that public embarrassment is one of the most common motives for false claims against individuals who cause such embarrassment.

100.  Smith told the panel that she felt "partly responsible for the situation, that she was the culprit," according to the summary of her interview.  She further stated that she "thought it is maybe harsh of her to report the incident" and added that "she was the stupid one."  As alleged above, she told the panel that she did not wish to pursue a formal complaint against Prof. du Quenoy.

101.  Smith told the panel that, on August 30, 2017, Prof. du Quenoy greeted her after class with a hug and accompanying cheek kisses.  Smith cited no witness to this alleged interaction.  Smith did not state that the alleged interaction was unwanted, or that she at any time told or otherwise communicated to Prof. du Quenoy that it was unwanted.

102. Smith further alleged that in the conversation that followed, Prof. du Quenoy suggested they meet for drinks off campus and further suggested that they might at some future time attend an opera, the subject Smith had previously studied with Prof. du Quenoy in his fall 2016 class, "Verdi's Operas."  The true facts, as Prof. du Quenoy accurately described them in his panel interview of November 21, 2017, were that Smith asked him to have drinks (specifically "to drink wine") off campus, and that he demurred, and that he never invited her to an opera. Prof. du Quenoy further reasonably maintained that an opera invitation (*i.e.* a performance in a public place involving thousands of other people involving a subject Prof. du Quenoy teaches) is not an act of "harassment."

103. Smith further alleged that she and Prof. du Quenoy discussed music and art, and that Prof. du Quenoy told her of a painting by a famous Russian artist (Valentin Serov's "Portrait of Ida Rubinstein," 1910), and that Prof. du Quenoy added that the artist's grandson had painted a watercolor copy for him that hangs in his home.  As Prof. du Quenoy correctly

told the panel during his interview on November 21, 2017, Smith asked him to send her an image of the painting, and he did so via Facebook messenger. (Smith had added Prof. du Quenoy as a Facebook friend sometime in Spring 2017, at which time she was not enrolled in any class taught by him). Smith never stated that receiving the image of the painting was "unwanted;" instead she replied to Prof. du Quenoy that it was "pretty."

104. Prior to her report to the Title IX office, Smith never claimed that the display of the image was offensive to her. In other words, the display of the painting, which is an abstract nude portrait in which no genitalia are depicted (unlike works of similar vintage by Picasso, Modigliani, and others which are regularly studied at universities, including AUB), only became offensive to Smith after the classroom incident of October 16, 2017, and at no earlier time.

105. Smith also alleged that Prof. du Quenoy invited her to his home, and that this also seemed to her to be a harassing comment, but only claimed so at the time of her report to the Title IX office.  Further, Prof. du Quenoy resided with his wife and young son, who were present at all relevant times herein, leaving no realistic motive, opportunity, or intent to perpetrate any act of misconduct.

106. Smith further alleged that Prof. du Quenoy asked her whether she would have a "problem" socializing with him since he is a married father, and that she allegedly perceived this question as a statement of alleged romantic interest.

107. Smith's account of the events of August 30, 2017 was substantially refuted by Witness #2, a male undergraduate AUB student, also enrolled in the class.  Witness #2 told the panel that Prof. du Quenoy did not subject Smith to any speech of a "romantic" nature, and that Smith behaved awkwardly during the exchange.  He also verified that Smith had behaved inappropriately during the classroom incident of October 16, 2017, and that Prof. du Quenoy

had handled the incident professionally.  (In Prof. du Quenoy's panel interview, he independently identified Witness #2 to the panel as an eyewitness to the conversation of August 30, 2017.)

108. Smith confirmed that after the alleged incidents of August 30, 2017, she continued to attend Prof. du Quenoy's class regularly and to participate by asking questions, and that she remained interested in the course material and continued to "appreciate" Prof. du Quenoy as a teacher.

109. Smith claimed that Prof. du Quenoy told her on one occasion, on an unspecified date, at an unspecified time, and in an unspecified public location, that she should not be physically attracted to Russian President Vladimir Putin, who is in his 60s, but rather to men in their 40s. Smith claimed, at time of her report to the Title IX office but at no time before, that she understood this alleged admonition to be a harassing suggestion that she should be romantically interested in Prof. du Quenoy, even though Prof. du Quenoy was in his 30s at all times between August 30, 2017 and October 16, 2017.  Smith did not state, nor did the panel find, that she communicated to Prof. du Quenoy that his alleged discussion of President Putin was hostile, intimidating, offensive, or unwelcome, or that she wanted him to refrain from such communications.

110. The final incident alleged by Smith allegedly occurred at another unspecified time and on another unspecified date off of AUB's campus.  Smith's only claim with regard to this alleged incident is that she encountered Prof. du Quenoy and that he hugged her with accompanying cheek kisses.  No witness verified or corroborated Smith's claim. Prof. du Quenoy, in his panel interview, denied that he hugged her on any occasion, and stated that he has never even seen Smith in any context off campus.

111. Prof. du Quenoy was interviewed following the interviews of Smith, and Witnesses #1 through #5.  Prof. du Quenoy's interview took place in the Title IX coordinator's office, with the entire panel present.  He was not permitted to record the proceedings or have counsel present, and still not allowed to read the complaint against him. According to Ms. Hodges's summary of her notes, "the panel advised Prof. du Quenoy that an allegation was received."  Even AUB's outdated Procedures of 2012 provide that "the Title IX coordinator [*i.e.* Ms. Hodges] is responsible for notifying the respondent of the allegation at an initial interview," but Ms. Hodges did not notify Prof. du Quenoy of the allegations at this or any other meeting.

112.  Panel member Srour spoke first.  Rather than begin with an explanation of the allegations against Prof. du Quenoy, he posed several leading questions such as "Do you know why you are here?" and required Prof. du Quenoy to answer before identifying the complainant and orally summarizing to Prof. du Quenoy any of the allegations against him.

113. Initially, the panel asked Prof. du Quenoy in detail about the classroom incident of October 16, 2017 and about his prior relations with Smith.  Prof. du Quenoy answered these questions honestly.  His description of the classroom incident of October 16, 2017 closely matched the descriptions gleaned from the panel's previous interviews with other students who had been present during the classroom incident, Witnesses #1, #2, and #5, and two additional witness who were interviewed later in relation to retaliation claims made by Prof. du Quenoy (Witnesses #14 and #15).

114. The panel also asked about Smith's allegations and whether Prof. du Quenoy had committed the alleged actions.  Prof. du Quenoy accurately denied having done or said anything inappropriate per Smith's false allegations and per AUB's Policies.

115. Prof. du Quenoy placed in context Smith's assertion that he had suggested they meet for drinks off campus, and further suggested that they might at some future time attend an opera.  The true facts, as Prof. du Quenoy accurately described them in his panel interview of November 21, 2017, were that Smith asked him to have drinks (specifically "to drink wine") off campus, and that he demurred because he spends most evenings at home with his wife and son, and finds Smith annoying.  Opera had been the subject Smith had studied in Prof. du Quenoy's Fall 2016 class, "Verdi's Operas," and, while denying that he invited Smith to an opera, Prof. du Quenoy reasonably maintained that an opera invitation (*i.e.* a performance in a public place involving thousands of other people and a subject Prof. du Quenoy teaches) is not an act of "harassment."

116. Prof. du Quenoy told the panel that he had never invited Smith to his home, even though doing so meets no definition of sexual harassment, including those expressed in AUB's Policies, and noted that he lives with his wife and young son, who were present at all relevant times herein.

117. In last few minutes of the interview, Ms. Hodges admitted to a clear and material violation of AUB's Procedures, having failed to inform Prof. du Quenoy that Smith's report was informal, and that it had been President Khuri who had elevated it to the status of a formal complaint and ordered a full investigation (in her words, "I should have said this before").

## G.    The Panel's Extra-Procedural Attempts to Impugn Prof. du Quenoy

118. With no evidentiary or factual basis other than Smith's false claims (which were contradicted by eyewitnesses) and an image of a famous Russian painting shown to Smith – a student in a Russian History class – at her request, the panel resorted to other means to support an adverse finding against Prof. du Quenoy.

119. Casting a wide net to find negative information about Prof. du Quenoy, the panel obtained all student evaluations of all courses Prof. du Quenoy had taught for his entire career at AUB (since 2008).

120. AUB's student evaluation procedure provides for both numerical scores (on a rising scale of 1.0 to 5.0) and written comments assessing the quality of the course and instructor. The procedure guarantees full anonymity for all students participating. AUB attempts to enforce the participation of all students by placing a lengthy hold on the final grades of those students who do not participate.

121. If Prof. du Quenoy had engaged in a pattern of misconduct, complaints of such behavior would likely have been recorded in nearly 10 years of anonymous student evaluations from a student body that was at all times since 2008 more than 50% female. Nevertheless, the student evaluations of Prof. du Quenoy's courses revealed the opposite: that Prof. du Quenoy has been at all times during his AUB career an excellent and highly respected teacher with far above average scores and almost unanimously positive written comments.

122.  Recognizing that the student evaluations were squarely at odds with the adverse finding the panel wished to reach, the panel expanded its inquiry further still, to interview numerous individuals with no apparent knowledge relevant to the investigation.

123. AUB's Procedures allow panels to interview "members of the AUB community who may shed light on the matter," but no others. The panel had no reason to believe that any member of the AUB community whom it subsequently interviewed was able to "shed light on the matter" of Smith's claims.  In fact, none of these witnesses provided any information that "shed light" on the claims. None had knowledge of Smith's allegations, was acquainted with Smith, attended the Fall 2017 Imperial Russia course, or was identified as a witness by any party.  Further, the panel interviewed at least two witnesses, Brittany Frye and Susannah

31

Stephens, who were no longer "members of the AUB community" at the time of their interviews or at any other time relevant to the investigation.

124. The panel began its series of procedurally improper interviews with Dr. Nadia Cheikh (Witness #6), Dean of AUB's Faculty of Arts and Sciences since 2015, and Chairman of the Department of History and Archaeology from 2013 to 2015.  Dr. Cheikh is reported to have said that she had observed Prof. du Quenoy with one history graduate student at some point off campus, and that Prof. du Quenoy had tried to help that student in her studies and professional goals. Dr. Cheikh did not say that she observed Prof. du Quenoy behaving inappropriately off campus with this graduate student or in any other way that would violate AUB Policies.  Dr. Cheikh vaguely recalled that the graduate student had at one time told her colleague, Prof. Alexis Wick (Witness #7) about "something," but that any concern had been "retracted" by the student.  Nonetheless, the panel interviewed Prof. Wick, who identified the graduate student by name, whom the panel interviewed as Witness #9.

125. According to Prof. Wick, Witness #9 had informed him of a purportedly "awkward incident" several years before.  Prof. Wick could not recall what this purportedly "awkward incident" consisted of.  Prof. Wick recalled that Witness #9 "didn't appear traumatized," that "she didn't appear afraid or intimidated," and that she did not want to report the "incident."  Accordingly, neither he nor Prof. Cheikh reported the incident, as would have been required by AUB's Policies had the incident constituted harassment (all AUB faculty members are "mandatory reporters" of discriminatory harassment).  Neither raised the issue with Prof. du Quenoy in any way.  Prof. Wick further confirmed that Witness #9 thereafter wanted Prof. du Quenoy to serve as her doctoral dissertation adviser, and that Prof. du Quenoy had supported Witness #9, among other students, in departmental efforts to include qualified graduate students in teaching opportunities.

32

126.  Prof. du Quenoy's annual performance evaluations, which were written by Dr. Cheikh in 2013-2015 (and other department heads at other times), make no mention of Prof. du Quenoy's interactions with Witness #9, or any other student.  Further, since 2013 the chairs of Prof. du Quenoy's department (including Dr. Cheikh) have occupied an office immediately adjacent to his, providing a singular opportunity to observe his workplace conduct, yet none has ever reported any misconduct or recorded any atmosphere of "fear" or "hostility" in the department.

## H.    Witness #9's False and Defamatory Testimony

127. In her panel interview, however, Witness #9 claimed that Prof. du Quenoy had, since 2013, subjected her to allegedly unwanted hugs and kisses upon greeting her and to occasional speech by him that she felt constituted harassment. Witness #9, however, never reported any such incident.

128. Witness #9 further stated that on one occasion she asked that Prof. du Quenoy not hug her – ostensibly because she was sick – and confirmed that he honored her request. She also stated, however, that she finds the hug and cheek kiss greetings to be "culturally appropriate," refuting any notion that they are "hostile, intimidating, or offensive," and confirming that she never objected to them on that basis.

129. In the rest of her interview, Witness #9 systematically defamed Prof. du Quenoy, claiming that she had conducted her studies in constant "fear" of him, believing that he "might physically attack" her, and that he "might try to get her kicked out of the Ph.D. program" if she complained. Prof. du Quenoy has never "attacked" or threatened to "attack" Witness #9 or anyone else, nor, as Defendants and Witness #9 are or should have been aware, is he or any other individual faculty member empowered by AUB policies to "kick out" any student. Witness #9 has never claimed, nor did the panel find, that she ever informed Prof. du Quenoy

33

that she found any aspect of his conduct "hostile, intimidating, or offensive," or otherwise inappropriate.   Her assertions were further undermined by her testimony that she went long periods of time without seeing Prof. du Quenoy, casting doubt on claims of a "pattern" of conduct or "atmosphere" of any kind, and still less any "conduct" or "atmosphere" of hostility, intimidation, offense, or fear.

130. No witness and no evidence corroborated the purported "fears" described by Witness #9, nor did anyone suggest that they interfered with her duties as a Graduate Assistant employed by AUB or with her studies, which she is, upon information and belief, on schedule to complete in a timely manner. To the contrary, Prof. Wick's testimony confirmed the opposite, that Witness #9 appeared neither "afraid" nor "intimidated" (nor "traumatized") by her interactions with Prof. du Quenoy.

131. Further, Witness #9 was enrolled in Prof. du Quenoy's Spring 2013 graduate seminar, in which, upon information and belief, Witness #9 contributed to Prof. du Quenoy's perfect numerical score (5.0 on a scale of 1.0 to 5.0) in anonymous evaluations in which all students are recorded as having participated.  Consistent with her high regard for Prof. du Quenoy, in Spring 2014 Witness #9 voluntarily enrolled in another seminar taught by him, which was for her an elective, and in which she again contributed to a high above average evaluation.

132. Witness #9 claimed that Prof. du Quenoy "harassed a lot of people," but could not recount any details.  The panel knew independently from Prof. du Quenoy's personnel file that there were no complaints to substantiate this reckless claim prior to Smith's informal reporting in October 2017.

133. Witness #9 did not allege, and the panel did not find, that Prof. du Quenoy engaged or attempted to engage in any act of sex, attempted sex, sexual assault, sexual

touching, sexual coercion, sexual or other physical violence, stalking, daily or otherwise regular or frequently repeated unwanted advances or physical contact (e.g. daily or otherwise regular or frequently repeated hugs or kisses), "unnecessary physical proximity," "sexually degrading language," "display of sexually suggestive objects or images in the workplace," "sexually-oriented messages or images sent by SMS or e-mail;" or any other action defined or implied as "sexual harassment" under AUB's Policies.

134. In truth, Witness #9 maintained a friendly relationship with Prof. du Quenoy that was thoroughly documented in a large number of e-mail and social media messages from her to him, including: "Thanks, PdQ, you're the best!!!" (September 21, 2015), "bring [your son] to the history department Christmas party?" (November 25, 2015); "I'd be on the streets without your help" (April 20, 2016, e-mail asking Prof. du Quenoy to be her doctoral dissertation adviser); "You're the best. I'd be lost at sea without you!" (June 20, 2016, e-mail about potential teaching opportunities in AUB's History and Archaeology Department); "Thank you for always, ALWAYS, having my back. . .  I profoundly appreciate everything you did to help me in this matter" (November 7, 2017); "Awesome!!!!" (December 4, 2017, response to a potential publishing opportunity); and numerous invitations to lunch (January 26, 2016, August 23, 2016, November 30, 2016, January 18, 2017, December 4, 2017), and dinner (September 11, 2017 and October 11, 2017).

135. Most significant was Witness #9's admission to the panel that she had lied to Prof. Wick about the resolution of the purported "awkward incident" she had mentioned to him in 2014. The panel noted her dishonesty (both versions of panel final report: "she admits she lied to Wick"), but nonetheless inexplicably found her "credible," and, upon information and belief, did so because she is a woman.

136. Ignoring all of this evidence and the requirements of AUB's Policies, the panel nevertheless found that Witness #9's claims constituted "attempted physical contact (kissing) of a sexual nature," and listed this alongside its biased acceptance of Smith's false claims in justifying its erroneous finding. The panel does not appear to have considered that customary social "kissing" is not a sexual act. Further, the panel disregarded AUB's procedural requirement that alleged misconduct be reported within 90 days of any alleged incident. Witness #9 alleged no incident at any time in the 90 days prior to her panel interview, but rather made claims about alleged incidents that allegedly occurred several years before.

137. Despite the weight that the panel assigned to Witness #9's false claims, it never provided a summary of her interview to Prof. du Quenoy prior to issuing its "final report" on January 10, 2018, nor asked him any questions about her or her false and defamatory testimony.

138. Prof. du Quenoy first learned of Witness #9's testimony upon reading the panel's first version of its "final report" at AUB's New York Office on January 18, 2018. On January 19, 2018, Prof. du Quenoy submitted to the panel some of the e-mails he had received from Witness #9, detailed above, along with his written response. On January 23, 2018 – despite having concluded its investigation and issued a "final report" – the panel interviewed Witness #9 a second time. When confronted with significant evidence that refuted her false allegations, she stated, incredibly, that her well-documented friendly relationship with Prof. du Quenoy was nothing more than a vast, multi-year manipulation campaign (in her words, "It was definitely manipulative"). Her alleged purpose was to benefit from Prof. du Quenoy's support as an "ally" in the Department of History and Archaeology to help her advance, despite her false and defamatory claim that Prof. du Quenoy is a "sexual predator." Prof. du Quenoy has no criminal or disciplinary record that would justify this defamatory claim. Despite Witness

#9's open admissions of dishonesty, the panel did not change its favorable assessment of her "credibility," believed her, and relied on her testimony in reaching its erroneous finding. At the same time, the panel did not consider that Witness #9's claim that she engaged in a five-year manipulation campaign precluded any possibility that she ever indicated or communicated to Prof. du Quenoy that she found any aspect of his speech or conduct to be "hostile," "intimidating," "offensive," "unwanted," or otherwise inappropriate.

139. Notably, Witness #9 never filed any complaint against Prof. du Quenoy, nor did any third party with knowledge of any alleged improper conduct ever file a complaint on her behalf.

140. Multiple statements Witness #9 made to the panel, described above, constitute defamation, which further is unprivileged because Prof. du Quenoy was given no opportunity to confront Witness #9 in any proceeding.  Prof. du Quenoy may amend this complaint, with leave of court if required, to include a claim for defamation against Witness #9 as investigation and discovery progress.

## I.      The Panel Violated Prof. du Quenoy's Privacy.

141.  The false testimony of Witness #9 led the panel on yet another futile search for evidence to impugn Prof. du Quenoy, in the form of purported photographs of Prof. du Quenoy with "young AUB students in bikinis," which she claimed to have viewed on his Facebook page.

142. No AUB policy prohibits faculty members from socializing with students in any attire (the campus is seafront and has its own beach), nor did Witness #9 claim that the photos contained evidence of sexual misconduct, of any other form of discriminatory harassment, or of anything pertaining to Smith's claims, or her own false and defamatory statements. Nevertheless, the panel decided to obtain access to Prof. du Quenoy's Facebook account.

143. Upon information and belief, AUB provides a strict data protection policy that forbids the university from accessing faculty members' private electronic information – including even information stored on AUB-owned servers and computer hard drives and the contents of official AUB e-mails – without the permission of the faculty member in question. Upon information and belief, this protection extends to private social media platforms, including Facebook.  At all times relevant to the investigation, Prof. du Quenoy's Facebook account was set to the maximum privacy setting; only individuals who were his Facebook "friends" could see his pictures or any other post.  The panel at no time asked Prof. du Quenoy's permission or authorization to view his Facebook account, nor did Prof. du Quenoy provide any such permission or authorization.

144.  The panel's accessing of Prof. du Quenoy's Facebook, whether on its own or by proxy, violated AUB's data protection policies, and Prof. du Quenoy's rights of privacy under U.S. and New York law.

145. The panel, however, found no evidence from Prof. du Quenoy's Facebook account that he appeared in any photo with "young AUB students in bikinis," any evidence of misconduct, any other violation of AUB's Policies, or anything having to do with Smith and her false claims.  Those photos that contained images of people depicted friends and acquaintances of Prof. du Quenoy outside the AUB community, students at other universities, and people at a graduation party for AUB alumni (known as "Aftergrad"), who attended the party precisely because they had graduated (and thus were no longer AUB students; none was clad in a bikini). Only one photo in the Facebook montage shows Prof. du Quenoy with an AUB student, a fully dressed young man who is the son of close friends of Prof. du Quenoy.

146. Further, the panel does not appear to have considered that the existence of numerous photographs of Prof. du Quenoy with young people suggests the opposite of its

erroneous finding: that Prof. du Quenoy is a popular individual with many friends and acquaintances who happily and voluntarily socialize and take photos with him without any claim or allegation of misconduct.

147. Prof. du Quenoy provided information about each of these individuals depicted in his written responses to both versions of the panel's final report. Neither the panel nor President Khuri made any effort to assess, verify, or challenge this information. Having failed to find any evidence of the kind it hoped for, the panel inexplicably found (and President Khuri concurred) that Prof. du Quenoy had violated AUB's Policies and that he was "guilty" of having "lied" to the panel about socializing with AUB students.

148. The panel claimed that Witness #9 and Witnesses Frye and Stephens "provided" it with posts and images collected from Prof. du Quenoy's Facebook account. The panel did not describe how, why, or under what circumstances these individuals "provided" this information. A review of the Facebook images strongly suggests (if the panel's statement is true) that these witnesses were directed to locate particular posts and images by the panel to fit its biases and to match its preconceived conclusions that Prof. du Quenoy was guilty of violating AUB's Policies. A panel note included in its final report claims that one post was later deleted, indicating that the panel and/or its proxies reviewed the Facebook account multiple times. The panel thus engaged, illegally and in violation of AUB's data protection policies, in an active monitoring of, and copying from, Prof. du Quenoy's Facebook coordinated with witnesses.

**J.**  **Witnesses Interviewed Established Prof. du Quenoy's Innocence.**

149. Witness #1 was the only witness Smith named in the entire course of the investigation. His testimony did not support her interpretation of events, but rather supported Prof. du Quenoy's accurate statement that he had not addressed Smith with speech of a "romantic" nature on any occasion when he was present. Witness #1 told the panel that he

recalled an exchange involving President Putin, but that he did not believe it constituted

"sexual harassment."  He also confirmed that Smith had behaved inappropriately during the

classroom incident of October 16, 2017 and that Prof. du Quenoy had handled it professionally.

He further stated that Prof. du Quenoy is a "good professor."  The panel's report did not

question or deny Witness #1's objectivity or credibility.  Instead, the panel simply ignored

Witness #1's testimony when reaching its finding.

150.  Witness #2, another male undergraduate in Prof. du Quenoy's class, was initially

selected by the panel at random from among the students in Prof. du Quenoy's class.  The

panel interviewed him a second time after Prof. du Quenoy independently identified him as a

witness.  Witness #2 largely substantiated Prof. du Quenoy's version of events, including

Smith's flirtatious manner on August 30, 2017, at which, he stated, Prof. du Quenoy seemed

"taken aback." The panel discounted Witness #2's testimony, purportedly because he could not

completely recall all details of a conversation three months earlier that he had no reason to

recall.  In contrast, the panel credited Smith's testimony in its entirety, blamelessly, and

without question even though she could not recall the dates, times, and locations of two of the

three incidents about which she expressed concern, both of which happened closer in time to

her interview.

151. Witness Frye, an AUB alumna (graduated 2016) who was not a "member of the

AUB community" and whose interview thus violated AUB's Procedures, stated that she had

disliked a news article Prof. du Quenoy had posted on his Facebook account and felt "a bit

uncomfortable" about him, but confirmed that they had "zero contact" ever since.

152.  Witness Nabeeha Ossailly, Secretary of the Department of History and

Archaeology, stated that she had heard unflattering rumors about Prof. du Quenoy that caused

her to feel uncomfortable, but confirmed to the panel that he had never behaved inappropriately

toward her. She claimed to have seen greet other individuals with a hug, but did not characterize those greetings as harassment, hostile, intimidating, offensive, unwanted, or otherwise inappropriate. Like Witness #9, Ossailly further stated that she rarely sees Prof. du Quenoy, thus corroborating that Prof. du Quenoy could not have maintained any "pattern of conduct" or "atmosphere" of any kind.

153.  Witness #10, a female graduate student and history department Graduate Assistant, reported that Prof. du Quenoy had once invited her to lunch to thank her for photocopying class materials, a burdensome task not required by her job duties. Witness #10 declined the lunch, and did not state that he invited her to lunch on any other occasion. She continued that Prof. du Quenoy had asked her occasional personal questions that she felt uneasy about, but did not claim that such questions rose to any definition of sexual harassment or that she found them to be "hostile, intimidating, or offensive" per AUB's Policies. Further, Witness #10 contributed to an above average evaluation of a graduate seminar taught by Prof. du Quenoy in Spring 2017 and, upon information and belief, completed her M.A. in June 2018 with no actual or claimed disruption to her studies. Frye, Ossailly, and Witness #10 did not claim that Prof. du Quenoy ever made or attempted to make any kind of physical contact with them of any kind.

154. Witness Stephens, an AUB alumna (graduated 2016) who was not a "member of the AUB community" at any time relevant to the investigation and whose interview thus violated AUB's Procedures, stated that she had maintained positive "collegial contact" with Prof. du Quenoy for more than one and one-half years since her graduation in 2016, that *she* had frequently invited *him* to lunch and drinks on a friendly basis, and that she had enjoyed a charitable event chaired by Prof. du Quenoy and his wife, which she hoped to attend again. Stephens did not claim that she ever informed Prof. du Quenoy that any aspect of his conduct

or speech was hostile, intimidating, or offensive to her or that she asked him not to engage in it. To the contrary, Stephens stated that she initiated and maintained cordial communications with Prof. du Quenoy, similar to those of Witness #9, and valued and continued her relationship with Prof. du Quenoy long after she graduated for its potential social and professional benefits.

155.  The panel erroneously interpreted this testimony as evidence that Prof. du Quenoy had attempted to establish a harassing "power relationship" over Stephens, who completed her M.A. on time and with distinction under Prof. du Quenoy's supervision, and was no longer a member of the AUB community.  The opposite is well documented in numerous other friendly messages initiated by her.  Stephens further acknowledged having invited Prof. du Quenoy to a Thanksgiving party at her home in November 2016, some six months *after* she had graduated from AUB.

## K.    The Panel Failed to Address Retaliatory Acts Against Prof. du Quenoy.

156. The panel received compelling, objective evidence that Smith's claims were not only false, but were made in bad faith and with malice.  Prof. du Quenoy presented e-mails he received on December 19 and 20, 2017, from three male students in his Imperial Russia class, informing him that Smith had informed other students that she was responsible for the investigation and that Prof. du Quenoy would not be present teaching at AUB in the Spring 2018 semester.  Two of the students agreed to be identified by name to the panel and were interviewed as Witnesses #14 and #15.  Witnesses #14 and #15 substantiated that they had heard rumors that Smith told other students that she was responsible for the investigation and that Prof. du Quenoy would not be present at AUB in the spring semester.  In response to the evidence of Smith's boasting, the panel found Smith blameless, but found that Prof. du Quenoy acted "in bad faith" by bringing the matter to the panel's attention.  Smith admitted that she had told details of the investigation to two students at other universities, then claimed

disingenuously that she had not spread the rumors. In his decision of February 15, 2018, President Khuri found Smith "not responsible" for any violation of AUB's Policies despite this admission and the testimony of two witnesses who confirmed the rumors.

157. Further, on December 11, 2017, an unidentified person vandalized Prof. du Quenoy's publicly available Wikipedia page, stating that Prof. du Quenoy "is currently under investigation for sexual harassment of an undergraduate female student, and would be smart to retire from AUB before his reputation is further jeopardized."  The person who made the edit had detailed knowledge of the investigation, motive to embarrass Prof. du Quenoy publicly, motive to presume his guilt before the conclusion of the investigation, and a retaliatory and threatening animus to force Prof. du Quenoy's departure from AUB.  Prof. du Quenoy reported the edit promptly, but the panel determined that there was no proof that Smith was responsible. Smith denied that she made the edit, but made the ominous claim to the panel that she and members of her family had other ways to harm Prof. du Quenoy if she so desired.  The panel took no notice of Smith's retaliatory animus in reaching its finding, and President Khuri made no account of it in his decision that she was "not responsible" for any violation of AUB's Policies.

158. Again, the panel found Smith blameless in relation to the Wikipedia edit, and instead found that Prof. du Quenoy had acted "in bad faith" simply by bringing the matter to the panel's attention.

**L.      AUB's Policies and Procedures
Were Outdated, and Biased as Applied.**

159. AUB's Policies and Procedures of 2012, which governed the investigation of Prof. du Quenoy, were outdated and not compliant with the DOE OCR's 2017 Guidance.  The Procedures were designed, and operated, to discriminate against persons accused of sexual harassment.

43

160. AUB's Procedures permit complainants to file complaints of harassment within 90 days of first experiencing "harassing behavior." While "individuals accused of discriminatory harassment may request a formal investigation" of allegations against them, however, they are subject to a 30-day time limit.

161. The panel assured Smith that it was "there to protect" her, and in line with its biases and biased training, it thus accorded her blamelessness and a presumption of truth because she is a woman. The panel never informed Prof. du Quenoy that it would protect him, and did not do so, upon information and belief, because he is male.

162. Per AUB's Procedures, "the university ombuds" or "the Title IX Coordinator" are to give complainants "assistance in determining the exact nature of the complaint and the appropriate procedure to be followed" prior to any investigation.  AUB's Procedures include no provision for assisting respondents in these ways, or in any way at all.

163. The nature of Smith's concerns and of their elevation to the status of a formal complaint by President Khuri, were kept "deliberately vague" for the obvious purpose of preventing Prof. du Quenoy from forming an adequate defense, well considered response, or composed reaction prior to a panel interview – all protections guaranteed by the 2017 Guidance and deliberately violated by Defendants in their deliberate failure to observe the 2017 Guidance.

164. Prof. du Quenoy was not permitted to have counsel or any other member of the legal profession present, and was not permitted to record the interview, as stated in President Khuri's letter to him of November 7, 2017.  AUB deliberately withholds these measures in order to impair a respondent's ability to defend himself and to limit his access to due process, basic fairness, and an evidentiary record of the case.

165. Upon information and belief, neither the panel nor President Khuri considered the option of an informal resolution of Smith's complaint or any other kind of mediation, as permitted by both the 2017 Guidance and AUB's Procedures. AUB maintains and employs informal processes for the resolution of discriminatory harassment allegations, and complainants may pursue either or both options. While Smith elected an informal procedure and both declined to file a formal complaint and objected to any sanction of Prof. du Quenoy, Defendants deliberately ignored Smith's preferences because they had motive and bias to find Prof. du Quenoy "responsible" for harassment and to punish him severely because he is male.

166. Prof. du Quenoy was never allowed to read Smith's written statement, and was not permitted to read or have a copy of Smith's interview summary before his own interview on November 21, 2017. He was only allowed to review these documents eight days later. On that occasion Ms. Hodges physically attempted to remove them from Prof. du Quenoy's hands before he completed his review.

167. The panel did not reveal to Prof. du Quenoy its interviews with anyone other than Smith during his interview or at any other time before it issued the first version of its final report on January 10, 2018. The information imparted in these interviews, especially with Witnesses #1, #2, #5, #14, and #15, should have compelled the conclusions that Smith's claims lacked credibility, and that Prof. du Quenoy had not violated AUB's Policies.

168. Posing questions to the complainant and witnesses, directly or through the panel, at a minimum, is an essential element of due process and fairness. AUB's Procedures do not prohibit posing questions to the complainant through the panel, and President Khuri specifically informed Prof. du Quenoy in his letter of November 7, 2017, "you will be permitted to ask questions of the interviewers."

169. Nevertheless, Prof. du Quenoy was barred from posing any questions to Smith, directly or through the panel.  Notably, Smith is reported to have told the panel that at unspecified times during the fall 2017 semester "she couldn't sleep," allegedly because of "what was happening" with Prof. du Quenoy, but added that she only "realized" this after reporting to the Title IX office.  Prof. du Quenoy asked Ms. Hodges via e-mail whether Smith had been examined by a medical doctor, and, if so, whether a second opinion had been sought. Hodges replied that "AUB's policy does not provide for a respondent to pose questions to the complainant or panel" and refused to answer the question.  No member of the panel is a physician, psychologist, or trained counselor.

170. When Prof. du Quenoy asked the panel during his interview whether it had any evidence of his alleged misconduct, Ms. Hodges replied, in an intimidating tone, "We don't need evidence." Title IX, however, *requires* an evidentiary standard, and AUB's Procedures expressly require the panel to "do its best to determine the facts" by the preponderance of the evidence standard.  In her interview summary, Ms. Hodges recorded her remarks in this way: "the panel clarified that often in these cases it is a matter of 'he said, she said' and that they [the panel] will assess credibility, motive, [and] try to corroborate certain points." Hodges did not state, even in her own notes, that the panel required any amount of evidence (a "preponderance" or otherwise) to make findings or recommend sanctions.

## M.  The Panel's Flawed Report and Erroneous Findings

171. Per AUB's Procedures, the panel, upon completing its investigation and issuing a "final report" including a finding and recommended sanction, and upon receipt of Prof. du Quenoy written response (submitted January 19, 2018), should have submitted the final report and response to President Khuri for his decision.  Ms. Hodges confirmed that the panel would do so in an e-mail to Prof. du Quenoy on January 9, 2018. In contravention of AUB's

46

Procedures, however, the panel continued the investigation (by, for example, interviewing
Witness #9 again on January 23, 2018), revised its findings, removed "Appendix E: Student
Evaluations" (i.e. ten years of student evaluations, which Prof. du Quenoy had directly cited as
exculpatory evidence), and issued a second version of the final report on January 30, 2018.

172. As it had done in the first version of its final report, the panel omitted from the
second version summaries of interviews with other individuals who were in a position to
observe Prof. du Quenoy on a daily basis in the workplace. Upon information and belief, these
individuals testified positively about him and, for that reason, all records of their interviews
were excluded from both versions of the final report.

173. The panel discounted the testimony of five male witnesses (one of whom was
identified by Smith and two of whom were apparently chosen by the panel at random) whose
testimony supported Prof. du Quenoy's version of the October 16, 2017 classroom incident
and, in the cases of Witnesses #14 and #15, his retaliation claims. The panel further failed to
consider that not even one witness, identified by Smith or otherwise, supported any of Smith's
false claims.

174. The panel found that Smith was "far more credible" than Prof. du Quenoy because
of her intangible and unrecorded "emotional responses" to the panel's questions and because
her story seemed to the panel to be "more detailed" and "self-reflective" than Prof. du
Quenoy's. The panel does not appear to have considered that Prof. du Quenoy's testimony was
less "detailed" and "reflective" because it consisted mainly, and accurately, of denials of
Smith's claims. Nor did the panel consider that Smith's "self-reflective" testimony dwelled at
length on her admission that she was at least partly at fault.

175. The panel drew a further absurd conclusion that the classroom incident of October
16, 2017 was not caused by Smith's violation of classroom policy and Prof. du Quenoy's

attempt to maintain classroom discipline, both widely witnessed, but because Prof. du Quenoy was "upset" that Smith had rejected his alleged "advances." The panel could only have reached this conclusion by discounting the testimony of Prof. du Quenoy and five witnesses, one of whom was identified by Smith herself and all of whom were male; by discounting Smith's own statements that she may have been responsible for the situation or otherwise at fault; by failing to consider that a university professor may have been legitimately upset by being argued with and insulted by a student during a formal class lecture; by ignoring the fact that Smith never testified to having communicated "rejection" of Prof. du Quenoy in any form; by failing to consider that Prof. du Quenoy never displayed or was claimed to have displayed any sign of being "upset" with Smith at any other time for any reason; by failing to consider the testimony of Smith's adviser Prof. Tehrani that Smith is "extremely sensitive;" by ignoring the fact that Smith never claimed to have asked Prof. du Quenoy to refrain from any form speech or conduct; and by entering the process with biased presumptions, reinforced by biased training, that Smith was blameless and that Smith's version of events was accurate and "far more credible" than Prof. du Quenoy's because she is a woman complaining of sexual harassment while Prof. du Quenoy is a man accused of sexual harassment.

176. The panel also listed among purported "aggravating factors" that Prof. du Quenoy had "denied the allegations against him" and failed to "show remorse and insight" even though neither AUB's Policies and Procedures nor Title IX requires respondents in sexual misconduct cases to admit guilt or allows institutions to impose harsher punishments on respondents who fail to admit guilt. Prof. du Quenoy's accurately stated insight was that on October 16, 2017 he embarrassed a female student who was widely witnessed to have violated classroom policy, who argued with and personally insulted him, and then raised false claims against him to the Title IX office the next day.

177. Despite being constituted as a "fact-finding panel," the panel made no "findings of fact" related to Smith's claims, but instead found it "more likely than not" that Prof. du Quenoy was "responsible" for violating AUB's Policies.  Being devoid of factual support of any kind, the finding, upon information and belief, was based on the biases of the panel, and the biased application of AUB's biased and outdated discriminatory harassment policies against Prof. du Quenoy because he is male.

178.  The panel heard no evidence, and did not find as a fact, that the alleged greetings and speech were unwanted or that Smith told Prof. du Quenoy so.  The panel found, summarily and without basis in fact, that each instance of conduct alleged was unwelcome or unwanted by Smith, and constituted hostile, intimidating, or offensive conduct of a sexual nature, despite the testimony of multiple objective witnesses to the contrary.  The panel's conclusions in relation to these issues were contrary to eyewitness testimony and other evidence, and AUB's Policies (see Paragraph 96) and could only be the product of bias.

179. The panel accepted Smith's assertion that Prof. du Quenoy invited her to his home in order to subject her to acts of harassment therein, despite Prof. du Quenoy's clear denial, and the fact that his wife and young son resided in his home at all relevant times.

180. Both versions of the panel's "final report," issued first on January 10, 2018, and again, in violation of AUB's Procedures, on January 30, 2018, erroneously found it "more likely than not" that Prof. du Quenoy violated AUB's Policies in that he allegedly committed "unwanted hugging" and engaged in "non-consensual contact" with Smith on three occasions and engaged in "discriminatory speech of a romantic/sexual nature." The panel reached these erroneous findings even though Smith only alleged that Prof. du Quenoy hugged her on two occasions and could not recall the date, time, or location of alleged misconduct after the first day of class.

181. The panel found Prof. du Quenoy "responsible" for violating AUB's Policies, but did not cite a single policy or term of AUB's Policies that was violated. To the contrary, Prof. du Quenoy was not found to have done anything that rises to any definition of "sexual harassment," including those articulated in AUB's Policies.

182. Additionally, the panel erroneously found a supposed "pattern" of conduct on the part of Prof. du Quenoy based primarily on the false and defamatory testimony of Witness #9, whom the panel found "credible" despite her open admission that she lied about official university business and claim that she had engaged in a multiyear manipulation campaign of Prof. du Quenoy.

183. The panel further erroneously found that Prof. du Quenoy had attempted to establish "power relationships" over "female students" because he had, as one of his job duties, advised Witness #9, and others, at their request, about teaching, publishing, and other professional opportunities, and invited students to lunch, even though Prof. du Quenoy has shared meals with and advised many students of both sexes (a standard practice in academia that contravenes no AUB policy).  The panel failed to establish, and no witness alleged, the existence or terms of any purported demands or expectations imposed on any student by Prof. du Quenoy, or of any actual, supposed, or anticipated benefit he might have derived from any student.

184.  All of the improperly interviewed witnesses whose testimony was included in the final report except for Prof. Wick were women.  Upon information and belief, the panel discounted and ignored the testimony of all male witnesses (including Wick's) wherever it did not fit the conclusions that the panel wished to reach, and suppressed all evidence of the testimony of some witnesses who provided favorable testimony to Prof. du Quenoy.

185.   The panel included in its report a satirical image of President Khuri found in Prof. du Quenoy's Facebook account, created by a satirical social media source known as "Jafet Reservation Services" in response to a violent incident in November 2017 in which AUB's campus security, apparently acting with President Khuri's approval, broke up a student protest of arbitrary reductions in graduate student funding.  Prof. du Quenoy had supported the students' cause and was a vocal critic of President Khuri's mishandling of the situation, an opinion widely shared among AUB faculty and students and in the international media. Inclusion of this image was gratuitous in that it had no bearing whatsoever on the subject of the investigation. Upon information and belief, it was only included with the malicious intent to incite President Khuri to impose a severe sanction on Prof. du Quenoy in the absence of any evidence of any violation of university policy.

186.   The panel included several other irrelevant images and posts, obtained from Prof. du Quenoy's Facebook account, that had nothing to do with the investigation, including posts referring to sexual themes in the operas *Tristan und Isolde* by Wagner and *Der Rosenkavalier* by Richard Strauss, part of the subject matter of Prof. du Quenoy's Fine Arts classes.  These classes and their syllabuses were reviewed and approved by AUB's Department of Fine Arts and Art History and by AUB's office of General Education for full humanities credit, and the themes, sexual and otherwise, are thoroughly referenced in scholarship and appropriate for classes offered to adults.  No student nor any other member of the AUB community has ever complained about the teaching of these materials. They were maliciously included in the final report to falsely suggest inappropriate activity in support of the panel's erroneous findings.

187.   In sum, the panel knowingly and willingly violated AUB's policies and procedures in order to discredit Prof. du Quenoy, and also knowingly and willingly suppressed evidence favorable to him, in addition to illegally violating his privacy to smear his character.

**N.**     **AUB Committed Acts of Retaliation Against Prof. du Quenoy.**

188. AUB's Policies state that AUB "prohibits retaliation against any person who provides evidence or otherwise participates in the investigation or resolution of a complaint." President Khuri's letter to Prof. du Quenoy of November 7, 2018 invited him to contact Ms. Hodges "if at any point in this process you experience actions you perceive as retaliation."

189.  During his panel interview on November 21, 2017, panel member Srour's selective reading of Smith's complaint recounted that she had called Prof. du Quenoy a "narcissist" in the course of the classroom incident of October 16, 2017 (in other words, an assertion in public that Prof. du Quenoy suffered from a serious psychological illness).  The panel and Ms. Hodges informed Prof. du Quenoy that he could file a complaint against Smith. Accordingly, Prof. du Quenoy filed a complaint, only to be charged with "bad faith" by the panel, which also, but contradictorily, found that Smith's speech (which she admitted) was "inappropriate."

190.  In the two other instances in which Prof. du Quenoy brought perceived retaliation to the attention of the panel – the matter of the rumors identified as having originated with Smith and of the Wikipedia edit - the panel and President Khuri found that Prof. du Quenoy's reports were also in "bad faith" despite the panel's acknowledgment that these incidents happened and Prof. du Quenoy's clear statements to the panel that he perceived them to be retaliatory.

191.  On January 21, 2018, Prof. du Quenoy notified AUB and President Khuri that he had retained legal counsel in connection with the Title IX investigation.  In retaliation, the panel recommended to President Khuri that he place Prof. du Quenoy on administrative leave, ban him from campus, and curtail his access to AUB facilities (with the exception of medical treatment), colleagues, and students.  President Khuri followed this recommendation, which

was announced in a memorandum provided to Prof. du Quenoy on January 24, 2018. These measures constituted a substantial reduction of professional duties, including the abrupt and embarrassing cancellation of Prof. du Quenoy's scheduled Spring 2018 courses, from which AUB required all enrolled students to withdraw with the false assertion that Prof. du Quenoy was "unable to teach this semester."

192. AUB's Procedures state that "the University may take immediate interim measures pending an investigation," and that it may do so "upon receipt of information concerning formal or informal allegations of sexual or other discriminatory harassment."  AUB imposed no "interim measures" of any kind against Prof. du Quenoy, including even a "no contact order," at any time for more than *three months* between Smith's report to the Title IX office on October 17, 2017 and Prof. du Quenoy's referral of the matter to legal counsel on January 21, 2018. During that time, Prof. du Quenoy continued his work without incident, including his teaching two fall semester classes enrolling nearly 50 AUB undergraduate students drawn from an undergraduate student body that was at that time 59% female.  Defendants AUB and Khuri thus recognized that Prof. du Quenoy posed no threat to the "safety" of Smith or anyone else at AUB.  AUB only adopted "interim measures," all of which were adverse to Prof. du Quenoy, in retaliation for his seeking legal representation to assist him against the Defendants' discriminatory and retaliatory actions.  Defendants have never articulated a justification for these "interim measures," despite numerous requests.

193. The panel's flawed "final report," issued January 30, 2018, was another instance of retaliation for Prof. du Quenoy's good faith efforts to defend himself, oppose discriminatory and retaliatory treatment to which he had been subjected, and defend his due process rights.

194.  President Khuri retaliated further by placing Prof. du Quenoy in jeopardy of immediate termination for cause when, by letter of March 23, 2018, he issued a "final

warning" to intimidate Prof. du Quenoy should he ever discuss, by any means in any forum, advancing legal claims against any individual who participated in the investigation.  This "final warning" was predicated on no other warning of which Prof. du Quenoy was ever aware and asserted unwarranted prohibitions over Prof. du Quenoy's legal rights and right of expression.

195. On April 19, 2018, Prof. du Quenoy's department chairman Prof. Hermann Genz circulated a memorandum to the department, and to Dr. Cheikh as Dean of the Faculty of Arts and Sciences, stating that "it is not clear if [Prof. du Quenoy] will return" following his administrative leave.  There was no basis for this supposition.  This statement constituted retaliation against Prof. du Quenoy by implying that he is not expected or welcome to return to work after his administrative leave, that the sanctions imposed by AUB are possibly intended to remove him from employment, and by damaging his reputation among colleagues and his future career prospects at AUB.

196. Shortly thereafter, Prof. du Quenoy was, without his knowledge or consent, removed from his department's faculty e-mail listserv, and can no longer receive any departmental correspondence, including such vital announcements as department policy and personnel decisions and mandatory administrative requirements (e.g. annual reports, self-assessments) incumbent on all faculty members regardless of leave status.  There is no known basis, or precedent, for this action, and no known AUB policy that allows or provides for it.  Prof. Genz confirmed via e-mail on July 12, 2018 that Prof. du Quenoy's removal was directly connected to his administrative leave but declined to state any reason or authority making the removal mandatory.

197. Prof. Genz also rendered a performance evaluation of Prof. du Quenoy for the 2017-2018 academic year, falsely stating that Prof. du Quenoy's teaching is "of marginal relevance to the department" even though Prof. Genz and all three previous department chairs

serving since 2008 had consistently praised Prof. du Quenoy's teaching for nearly a decade and never once questioned its "relevance" in any way.  Prof. Genz further falsely stated that Prof. du Quenoy's departmental service was "problematic" without basis and in the full knowledge, as department chair, that Prof. du Quenoy was involuntarily placed on administrative leave and banned from campus for more than half of the academic year under review.

**P.      The Sanction - A Disproportionate Response**

198. The DOE OCR's 2017 Guidance requires that "any disciplinary decision be made as a proportionate response to the violation," consistent with custom and basic fairness.  AUB, however, maintains no scale of penalties establishing the types of sanctions that may be applied to specific violations of AUB's Policies.

199.  In purported concurrence with the panel's erroneous findings, President Khuri sanctioned Prof. du Quenoy by (a) placing him on administrative leave without pay until August 31, 2019;  (b) banning him from campus until August 31, 2019 (except for the medical center for personal and family medical needs and scheduled human resources visits);  (c) forbidding him to contact until August 31, 2019 "any individual who is (or was) a student of AUB" as of February 15, 2018;  (d) placing him on permanent probation for the entire remainder of his academic appointment at AUB;  (e) forbidding him from meeting privately (i.e. with his office door closed and/or locked) with any student at any future time; and (f) banning him from serving until February 15, 2021 as a department chairman, member of the Faculty Senate, member of any Faculty Senate committee, and member of AUB's Faculty of Arts and Sciences' Advisory Committee.

200.  President Khuri provided no plausible rationale or explanation for his decision that Prof. du Quenoy was "responsible" for violating AUB's Policies. In fact, President Khuri provided no rationale of any kind for his decision, no analysis of evidence or the panel's

findings, nor any data regarding sanctions in similar matters. The terms of the sanction imposed by President Khuri were wildly disproportionate to an alleged policy violations.

201. Further, Defendants have provided no rationale for depriving Prof. du Quenoy of his salary as furthering the goals of "protecting" the "safety" of any individual at AUB. While AUB maintains a sanction of administrative leave *with* pay, President Khuri deliberately chose to deny Prof. du Quenoy pay for one and one-half years, upon information and belief, to compel his resignation, or inflict unjustified punishment.

202. Upon information and belief, AUB employees who have been found "responsible" for much more serious violations than those alleged in this case have received considerably lesser sanctions.  Further, because Smith was scheduled to complete her studies and graduate on June 9, 2018, Prof. du Quenoy could have posed no "threat" to Smith in any AUB context after that date.  Defendants offered no rationale for extending Prof. du Quenoy's administrative leave for approximately fifteen months beyond that date, or for prohibiting Prof. du Quenoy from initiating contact with any other AUB student, including its several thousand male students, for the full duration of the administrative leave.

203. The only practical reason for, and the effect of, the disproportionate sanction and its terms was and is to discriminate against Prof. du Quenoy, to punish him for opposing discriminatory and retaliatory treatment, to prevent him from maintaining his innocence to the largest segment of the AUB community, to damage his reputation thereby, and to force his departure from AUB under threat of economic deprivation and personal and professional disgrace.

204. Additionally, Defendants have provided no rationale for violating Prof. du Quenoy's First Amendment and due process rights by prohibiting communication to oppose unlawful treatment or seek evidence in his pursuit of a remedy.

205. Prof. du Quenoy's sanction, therefore, stands out for its disproportionate severity under any standard.  As a result of Defendants' unlawful actions, Prof. du Quenoy has suffered enormous injury.  After 13 years of dedicated work as a university professor, ten of which were dedicated to supporting AUB's goals and mission with distinction and repeated rewards and praise by AUB, he has been constructively terminated. With a damning finding and severe sanction on his record, and in an already extremely difficult academic job market, he will almost certainly not be able to continue his professional career in any form, and will be effectively barred from pursuing numerous other career paths.

### FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972**
(American University of Beirut)

206.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

207.  Title IX of the Education Amendments of 1972 (20 U.S.C. §1681 *et seq*.) provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  Title IX applies to all public and private educational institutions that receive United States federal funding, within or outside the United States, including AUB.  AUB represents that anti-harassment protections administered by its Title IX office apply to all members of and visitors to its community, including faculty members.

208.  Prof. du Quenoy has standing to sue for relief under Title IX, in that (a) he has been materially injured by AUB's failure to comply with Title IX's provisions, with the rules and regulations of the Department of Education, and with its own Title IX policies and procedures; (b) he is a participant in an education program or activity of AUB, in that, as an associate

professor, he is pursuing further academic attainment based substantially on his scholarship, as judged by a community of academics (and not by AUB as an employer, or by the supervisors of his employment as such); and (c) violations of Title IX by AUB have gravely damaged his eligibility for such academic attainment separately and distinctly from the terms and conditions of his employment, including material injury to his prospects for participating in other academic pursuits or obtaining alternate employment.

209.  In addition, Prof du Quenoy is a proper party to enforce Title IX's requirements by means of a mandatory injunction that will have beneficial effects for all members of the AUB community accused of discriminatory harassment, including students.

210.  If the Court, the Court of Appeals for this Circuit, or the United States Supreme Court holds that Title IX protects employment rights of persons working in a covered educational institution, Prof. du Quenoy will amend this complaint to allege discrimination in employment under Title IX.

211. If the Court, the Court of Appeals for this Circuit, or the United States Supreme Court holds that Title IX protects employment-related rights of persons working in a covered educational institution, Prof. du Quenoy will amend this complaint to allege discrimination in employment under Title IX, and further, will amend this complaint to allege discrimination in violation of Title VII (42 U.S.C. §2000e-1, *et seq*.) upon exhaustion of administrative remedies.

212.  Title IX is violated when a school fails to prevent or remedy sex discrimination, including by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

213.  The disciplinary process and result in this case constituted (1) an erroneous outcome, in that Prof. du Quenoy was not responsible for any violation of AUB sexual harassment policy, or law, and gender bias was a factor motivating the erroneous outcome

(paragraphs 43-79, 81-87); and (2) an unjustly severe penalty substantially motivated by gender (paragraphs 198-205); and (3) a process of selective initiation, in that the decision to initiate the proceeding was affected by the respondent's gender (paragraphs 90-94).

214.  As a school covered by Title IX, AUB was required to adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints alleging any action which would be prohibited by Title IX or regulations thereunder. Prompt and equitable procedures include, at a minimum: (a) notice of the procedure, including where complaints may be filed, (b) application of the procedure to complaints alleging sexual harassment, (c) adequate, reliable, and impartial investigation of complaints, and (d) designated and reasonably prompt timeframes for the major stages of the complaint process.

215.  AUB failed to adopt or publish adequate procedures, as alleged in paragraphs 27-42, 159-162.  Gender bias was a factor motivating the failure to adopt or publish required procedures, as alleged in paragraphs 43-79, 80-87.

216.  AUB, through its agents, failed to apply such procedures as were adopted to fully, fairly, and impartially investigate the allegations against Prof. du Quenoy, as alleged in paragraphs 88-155, 163-197; and also failed to apply such procedures to fully, fairly, and impartially investigate Prof. du Quenoy's own complaints of harassment and retaliation, as alleged in paragraphs 156-158.

217.  AUB and its agents specifically failed to provide proper and adequate training to the persons investigating the matters described in the preceding paragraph, and in fact provided training that was biased against male members of the AUB community (paragraphs 80-87), with the proximate result that the panel conducted its investigation and used investigative techniques in a manner designed to credit Smith's "evidence" of

events despite its lack of consistency or credibility, and to discredit Prof. du Quenoy's

evidence, and evidence offered by five male witnesses, as alleged in paragraphs 70-86.

218.  AUB reached a decision that was directly at odds with the evidence the

panel had before it, and not in compliance with AUB's Policies defining sexual

harassment, as alleged in paragraphs 100-110, 127-136, and 170-197, and others.  The

decision was motivated by gender bias against Prof. du Quenoy.

219.  The panel suppressed, ignored, and/or misinterpreted credible evidence in

favor of Prof. du Quenoy, motivated by gender bias against Prof. du Quenoy.

220.  President Khuri violated Title IX, and AUB's Title IX policies and

procedures, motivated substantially by gender bias against Prof. du Quenoy, when he (a)

elevated Smith's informal concerns about Prof. du Quenoy to the status of a formal

complaint and full investigation without basis; (b) accepted the panel's gender-biased

findings and recommendation without analysis, knowing that the panel's procedures were

materially flawed given the absence of proper advance notice, an opportunity to pose

questions, adequate time to respond, and any presumption of innocence or other principle

of neutrality.

221.  AUB has created an environment of discrimination and discriminatory harassment

against male members of the AUB community by denying basic due process and fairness on the

basis of gender, and encouraging, promoting, and aiding false charges of sexual harassment.

222.  Upon information and belief, all or virtually all individuals punished by AUB for

sexual misconduct have been male. The dramatic increase in the number of respondents found

"responsible" and sanctioned for violating AUB's policies since President Khuri's installment as

president in September 2015, is evidence of individual and institutional biases against men.

223.  In sum, AUB's policies, procedures, and training not only fail to ensure a fair and impartial investigation and decision process, but guarantee unfairness and bias in every stage of these processes, in violation of Title IX.

224. The foregoing violations of Title IX have proximately caused Prof. du Quenoy to sustain substantial injury, damage, and loss, including, but not limited to irreparable damage to his academic advancement and future intellectual and career prospects, and injury to reputation. The injury to reputation may be irreparable, and poses the threat of continued application of Title IX by AUB in a manner that is unlawful and discriminatory on the basis of sex. Prof. du Quenoy is entitled to recover damages arising from Defendants' breaches of Title IX in the amount of $7,000,000.00, according to proof at trial, with pre- and post-judgment interest, attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(American University of Beirut)**

225.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

226.  A valid and enforceable contract exists between AUB and Prof. du Quenoy, for appointment as an associate professor, for a fixed term to expire on September 30, 2019.

227.  Prof. du Quenoy's contract expressly acknowledges that Prof. du Quenoy is entitled to the benefit of policies of AUB to the extent not expressly inconsistent with the terms of the contract.  Prof. du Quenoy was entitled to the benefit of such policies on the same basis as all similarly situated faculty and staff.   None of the policies described in paragraphs 37-40, 96 (among others), is inconsistent with any term of the contract.

228.  Prof. du Quenoy and AUB understood and agreed that AUB would fairly implement and enforce its official policies and procedures, as in force from time to time, and would comply with all relevant U.S. laws and directives.

229.  The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any decisions or other proceedings by which Prof. du Quenoy's rights under the contract could be materially changed would be conducted with basic fairness, and honesty in fact.

230.  As alleged above (in paragraphs 81-87, 111-124, 136-141, 156-187, and others), AUB has breached its express and/or implied covenants with Prof. du Quenoy, including the covenant of good faith and fair dealing, by failing to apply its policies fairly, on the same basis as all similarly situated faculty and staff, and by conducting proceedings involving his rights with dishonesty and unlawful bias.

231.  As a proximate and foreseeable consequence of AUB's breaches of contract, Prof. du Quenoy has sustained damages, including, without limitation, long-term loss of earnings and employment benefits, long-term loss of earning capacity, permanent injury to career opportunities, other economic injuries, and other damages, direct and consequential.

232.  Prof. du Quenoy is entitled to recover damages for the Defendants' breaches of the express and/or implied contractual obligations described above in the amount of $7,000,000.00, according to proof at trial, with pre- and post-judgment interest, attorneys' fees and costs.

## THIRD CAUSE OF ACTION
### Breach of Implied Contract: Denial of Basic Fairness, Arbitrary and Capricious Processes and Decision (American University of Beirut)

233.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

234.  The contract between AUB and Prof. du Quenoy was entered into effective October 1, 2012, nearly six years ago.  While that contract expressly provides that its "terms" may be "changed" only by a further agreement signed by the parties, a subsequent implied agreement has arisen between AUB and Prof. du Quenoy, based on the adoption of policies and procedures, and other representations, by AUB, continued and consistently satisfactory performance of duties by Prof. du Quenoy, and the course of dealing between AUB and Prof. du Quenoy.  As a result, AUB has impliedly agreed to take no action to deprive or impair such rights without basic fairness, or to take action against Prof. du Quenoy on any basis that is arbitrary and capricious.

235.  As alleged above (in paragraphs 81-87, 111-124, 136-141, 156-187, and others), AUB has breached these implied agreements with Prof. du Quenoy, by failing to apply its policies fairly, on the same basis as all similarly situated faculty and staff, and by conducting proceedings and making decisions in an arbitrary and capricious manner.

236.  As a proximate and foreseeable consequence of AUB's breaches of contract, Prof. du Quenoy has sustained damages, including, without limitation, long-term loss of earnings and employment benefits, long-term loss of earning capacity, permanent injury to career opportunities, other economic injuries, and other damages, direct and consequential.

237.  Prof. du Quenoy is entitled to recover damages for the Defendants' breaches of the express and/or implied contractual obligations described above in the amount of $7,000,000.00, according to proof at trial, with pre- and post-judgment interest, attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Estoppel, Detrimental Reliance
### (American University of Beirut)

238.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

239.  AUB's policies constitute representations and promises that AUB should have reasonably expected to induce action or forbearance by Prof. du Quenoy.

240.  AUB knew or should have known that Prof. du Quenoy would continue in his academic appointment in reliance on AUB's policies and representations.

241.  Prof. du Quenoy reasonably relied on such policies, to his detriment, by continuing in his appointment with AUB, and foregoing other academic and related opportunities.

242.  Prof. du Quenoy is entitled to a remedy in the nature of a claim for breach of contract, or quasi-contract, based on his detrimental reliance on the policies of AUB, and on the representations that such policies would be applied fairly and in good faith.

243.  As a direct and proximate result of the above conduct, Prof. du Quenoy sustained damages, including, long-term loss of earnings and employment benefits, long-term loss of earning capacity, permanent injury to career opportunities, other economic injuries, and other damages, direct and consequential.

244.  In addition, AUB has been unjustly enriched by services rendered in reliance on its policies and representations, and by the increase in academic stature conferred by publications and academic activities over and above that required by the terms of Prof. du Quenoy's appointment at AUB.

245.  Paul du Quenoy is entitled to recover damages sufficient to compensate for the detriment caused by his reliance, in the amount of $7,000,000.00, according to proof at trial, with pre- and post-judgment interest, attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### Violation of New York State Human Rights Law
### (American University of Beirut, Khuri, Hodges)

246.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

247.  AUB is a corporation organized and operating under the laws of the State of New York.

248.  The New York State Human Rights Law provides "[i]t shall be an unlawful discriminatory practice for an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status of any individual … to discriminate against such an individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 290.

249.  As a direct and proximate result of the actions alleged in paragraphs 48-80, 81-87, 90-96, 111-124, 135-145, 159-187, 189-197, above, Prof. du Quenoy sustained damages, including, without limitation, past and future economic loss; severe emotional distress; injury to reputation; deprivations of due process; and loss of future career prospects.

250.  Prof. du Quenoy is entitled to an injunction requiring his reinstatement by AUB and prohibiting further discrimination against him, and to damages for the Defendants' violations of the New York Human Rights Law, described above, in the amount of $7,000,000, according to proof at trial, with pre- and post-judgment interest, attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### Invasion of Privacy
### (American University of Beirut)

251.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

252.  The actions described in paragraphs 141-148 and 185-186 constitute an unjustified and unwarranted invasion and publication of the private affairs of Prof. du Quenoy.  By obtaining, monitoring, and exploiting access to Prof. du Quenoy's private Facebook postings and correspondence with relatives and personal friends, Defendants have intruded into Prof. du Quenoy's private affairs and personal solitude, appropriated his likeness, and portrayed him in a false and negative light.

253.  As a direct and proximate result of Defendants' invasion of Prof. du Quenoy's privacy, he has experienced injury to personal feelings and reputation, such as would be experienced by a person of ordinary sensibilities, and in a way that was entirely foreseeable to Defendants.

254.  Prof. du Quenoy is entitled to recover damages for the Defendants' invasions of his privacy described above for damages in the amount of $1,000,000 according to proof at trial, with pre- and post-judgment interest, attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (American University of Beirut, Khuri, Hodges)

255.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

256.  The actions of Defendants alleged in paragraphs 135-136, 141-147, 170-183, 188-205, above, were so outrageous and extreme as to go beyond all possible bounds of decency, and would be regarded as atrocious and utterly intolerable in a civilized community, in that:

(a)   Defendants should have acted with solicitude and concern for a professor at risk of being terminated from employment, with a dependent wife and child who was two years old at the time of the investigation;

(b)   Instead, Defendants pried into his personal affairs, and then lied about their findings in order to do him injury;

(c)   Defendants solicited false testimony against him, knowing it to be false, and nonetheless used it against him as though it were true;

(d)   Defendants deliberately and maliciously suppressed and removed exculpatory evidence in order to do him injury;

(e)   Defendants imposed multiple retaliatory measures in response to assertions of legal and professional rights in order to do him injury; and

(f)   Defendants succeeded in inflicting a severely disproportionate sanction on Prof. du Quenoy when he had done nothing wrong, and caused injury to him and to his family by cutting them off from financial support, academic opportunity, social interaction, and other pursuits,

all with the intent of causing him, and them, severe emotional distress, or with reckless disregard for whether such distress would result.

257.  Prof. du Quenoy in fact suffered severe emotional distress as a direct and proximate result of the extreme and outrageous actions of Defendants.

258.  Prof. du Quenoy is entitled to recover damages for the Defendants' intentional infliction of emotional distress, for damages in the amount of $1,000,000 according to proof at trial; with pre- and post-judgment interest, attorneys' fees and costs.

### EIGHTH CAUSE OF ACTION
### Declaratory Relief
### (American University of Beirut)

259.  Paul du Quenoy repeats and realleges the allegations of paragraphs 1 through 205, above, as if fully set forth herein.

260.  An actual and justiciable dispute has arisen between Plaintiff and the American University of Beirut, in that

(a)   AUB maintains that the investigation, findings, and sanction were accurate, substantially justified, and undertaken in good faith, and

(b)  Plaintiff alleges that the investigation, findings, and sanction were improper, contrary to policy and law, inaccurate, unjustified, and undertaken in bad faith.

263.  Plaintiff is entitled to a judgment pursuant to 28 U.S.C. §2201, declaring the rights and positions of the parties, and particularly, that the investigation, findings, and sanction were improper, contrary to policy and law, inaccurate, unjustified, and undertaken in bad faith.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Paul du Quenoy prays judgment against the Defendants as follows:

1.      On the first cause of action, for damages against American University of Beirut in the amount of $7,000,000 representing past and future economic losses, loss of career opportunities, physical and psychological injury, injury to reputation;

2.      On the second cause of action, for damages against American University of Beirut for breach of contract in the amount of $7,000,000, according to proof at trial, representing past and future economic losses, loss of career opportunities, and loss of future career prospects;

3.      On the third cause of action, for damages against American University of Beirut for breach of implied contract in the amount of $7,000,000, according to proof at trial, representing past and future economic losses, loss of career opportunities, and loss of future career prospects;

4.      On the fourth cause of action, for damages against American University of Beirut in the amount of $7,000,000, according to proof at trial, representing past and future economic losses, loss of career opportunities, injury to reputation, and loss of future career prospects;

5.      On the fifth cause of action, for damages against American University of Beirut in the amount of $7,000,000, according to proof at trial, representing past and future economic

losses, loss of career opportunities, and loss of future career prospects, physical and psychological injury, injury to reputation;

6.      On the fifth cause of action, for an injunction directing AUB to: (a) reverse the finding and decision; (b) nullify, void, and vacate in full the sanction and all its terms, prohibitions, and stipulations; (c) expunge Plaintiff's record of investigation, administrative leave and discipline related to this action, including from Plaintiff's personnel file and from the records of AUB's President's Office and Title IX office; and (d) expunge and destroy any record of Smith's complaint; (e) prohibit President Khuri or any person acting on behalf of AUB in the events alleged in this action from participating in any renewal of Plaintiff's contract, any application by Plaintiff for tenure, promotion to the rank of professor, or any other post or position, faculty or administrative, at AUB, including any appeal from any adverse decision in any of these processes; (f) that AUB adopt, immediately and in full, the U.S. Department of Education Office of Civil Rights' Guidance of September 22, 2017 for the adjudication of all reports of discriminatory harassment, including all cases involving allegations of sexual misconduct; (g) that AUB conduct a review of all investigations of discriminatory harassment processed after September 22, 2017 that resulted in any adverse finding against any respondent for compliance with the U.S. Department of Education Office of Civil Rights' Guidance of September 22, 2017; (h) that Ms. Hodges be prohibited from involvement in any future investigation or discipline of Plaintiff, or otherwise retaliating against Plaintiff; (i) that AUB provide to Plaintiff a formal letter of apology signed by Defendants Khuri and Hodges acknowledging that the investigation was procedurally improper and that the finding and decision were erroneous; (j) that AUB deliver a copy of the letter just described to all AUB administrators, faculty and students with knowledge of the investigation and/or sanction, including but not limited to the Provost, the Dean of Arts and

Sciences, Director of Human Resources, President of Faculty United organization, the Chair of the Department of History and Archaeology, the Chair of the Department of Fine Arts and Art History, the Director of AUB's music program, faculty members of AUB's Department of History and Archaeology, Smith, the witnesses interviewed by the panel, and students enrolled in Plaintiff's Fall 2017 course, "Imperial Russia," and Plaintiff's courses cancelled by AUB in the Spring 2018 term;

7.    On the sixth cause of action for damages against American University of Beirut in the amount of $1,000,000 according to proof at trial;

8.    On the seventh cause of action, for damages in the amount of $1,000,000 according to proof at trial;

9.    On the eighth cause of action, for a judgment pursuant to 28 U.S.C. §2201, declaring the rights of Paul du Quenoy and American University of Beirut, and specifically, that: (a) the findings and decision alleged in paragraphs 178-183 are void; (b) the sanction described in paragraph 199 is void; (c) Plaintiff has not violated any prohibitions on sexual harassment or sex discrimination, of the American University of Beirut or under any applicable law; (d) Plaintiff has no record of discipline; (e) Plaintiff has no record of administrative or disciplinary leave, from January 24, 2018 to the date of entry of judgment; (f) all seniority and time in position be restored to Plaintiff as though he had engaged in active employment without interruption from February 15, 2018 to the date of entry of judgment, and (g) Plaintiff is immediately entitled to all salary, benefits, benefit allowances, retirement contributions and other forms of compensation including salary payments commensurate with teaching two courses per summer session, from February 15, 2018 to the date of entry of judgment;

10.    For reasonable attorneys' fees and costs;

11.     For pre- and post-judgment interest on all sums awarded; and

12.     For such other and further relief as the Court deems just, equitable, and proper.

Dated: New York, New York
        August 2, 2018

Respectfully submitted,

LAW OFFICE OF STEVEN BARENTZEN

Steven Barentzen (NY Bar #2770147)
17 State Street, NW, Suite 400
New York, NY 10004
Tel: (917) 476-0953
Fax (202) 888-6268
Email: steven@barentzenlaw.com

*Attorney for Plaintiff Paul du Quenoy*

*Of counsel*

Theodore S. Allison, Esq.
1750 K Street, NW, Suite 700
Washington, DC 20006
Tel: (202) 331-7600
Fax: (202) 618-6211
Email: tsallison@karrallison.com

71

## JURY DEMAND

Paul du Quenoy respectfully requests and demands a trial by jury of all claims and issues

for which trial by jury is provided under the constitution and laws of the United States and New

York.

Dated:  New York, New York
       August 2, 2018

                           Respectfully submitted,

                           LAW OFFICE OF STEVEN BARENTZEN

                           Steven Barentzen (NY Bar #2770147)
                           17 State Street, NW, Suite 400
                           New York, NY 10004
                           Tel: (917) 476-0953
                           Fax (202) 888-6268
                           Email: steven@barentzenlaw.com

                           *Attorney for Plaintiff Paul du Quenoy*